Daniel Lammie (Bar No. 345838)
HAYNES AND BOONE, LLP
112 East Pecan Street, Suite 2400
San Antonio, TX 78205
Telephone: (210) 978-7000
Facsimile: (210) 978-7450
Daniel.lammie@haynesboone.com

Letitia Johnson-Smith (Bar No. 355642)
HAYNES AND BOONE, LLP
600 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001
Letitia.johnson-smith@haynesboone.com

Brent R. Owen (Bar No. 45068)
Allison Regan (Bar No. 61960)
HAYNES AND BOONE, LLP
675 15th Street, Suite 2200
Denver, CO 80202
T: (303) 382-6200
F: (303) 382-6210
Brent.owen@haynesboone.com
Allison.Regan@haynesboone.com
**[PRO HAC VICE]**

Attorneys for Defendant
TARGET CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIGEN TOVMASYAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TARGET CORPORATION, a corporation, and DOES 1-20, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-02314-MRA-KS<br><br>Assigned to District Judge:<br>Hon. Monica Ramirez Almadani<br><br>**DECLARATION OF LETITIA JOHNSON SMITH IN SUPPORT OF DEFENDANT TARGET CORPORATION'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing<br>Date:      April 14, 2026<br>Time:      10:00 a.m.<br>Courtroom:  9B |

## DECLARATION OF LETITIA JOHNSON SMITH

I, Letita Johnson Smith, hereby declare as follows:

1.    I am an Associate at Haynes and Boone, LLP and counsel for Defendant Target Corporation ("Target") in the within action.  I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently thereto.  I make this Declaration in support of Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (the "Motion") against Plaintiff Vigen Tovmasyan ("Plaintiff").

2.    Attached hereto as **Exhibit A** is a true and correct copy of the Complaint filed on March 14, 2025.

3.    Attached hereto as **Exhibit B** is a true and correct excerpted copy of Defendant Target Corporation's Responses to Plaintiff's Interrogatories, Set One.

4.    Attached hereto as **Exhibit C** is a true and correct excerpted copy of Plaintiff Vigen Tovmasyan's Responses to Defendant's Interrogatories, Set One.

5.    Attached hereto as **Exhibit D** is a true and correct excerpted copy of the deposition transcript of Courtney Anne Jacobson, taken on December 3, 2025 and Deposition Exhibit 3 to that deposition.

6.    Attached hereto as **Exhibit E** is a true and correct copy of produced document bates labeled [TARGET_00000019-22].

7.    Attached hereto as **Exhibit F** is a true and correct copy of produced document bates labeled [TARGET_00000023-29].

8.    Attached hereto as **Exhibit G** is a true and correct copy of produced document bates labeled [TARGET_00000050-53].

9.    Attached hereto as **Exhibit H** is a true and correct redacted copy of Deposition Exhibit 7 to Courtney Anne Jacobson's deposition and produced document bates labeled [TARGET_00000189-193], which Target was granted leave to file under seal. Dkt. 43.

///

- 1 -

10.     Attached hereto as **Exhibit I** is a true and correct copy of produced document bates labeled [TARGET_00000070-74].

11.     Attached hereto as **Exhibit J** is a true and correct copy of produced document bates labeled [TARGET_00000030-33].

12.     Attached hereto as **Exhibit K** is a true and correct <u>redacted copy</u> of produced document bates labeled [TARGET_00000344-348], which Target was granted leave to file under seal. Dkt. 43.

13.     Attached hereto as **Exhibit L** is a true and correct excerpted copy of the deposition transcript of Vigen Tovmasyan, taken on December 5, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 3, 2026, at Costa Mesa, California.

_____
Letitia Johnson Smith

DECLARATION OF LETITIA JOHNSON SMITH IN SUPPORT OF DEFENDANT TARGET CORPORATION'S MOTION FOR SUMMARY JUDGMENT
Case No.: 2:25-cv-02314-MRA-KS

# EXHIBIT A

**MALK & POGO LAW GROUP, LLP**
Valter Malkhasyan (SBN 348491)
*valter@malkpogolaw.com*
Erik Pogosyan (SBN 345650)
erik@malkpogolaw.com
1241 S. Glendale Ave, Suite 204
Glendale, CA 91205
Tel: (818) 484-5204
Fax: (818) 824-5144

*Counsel for Plaintiff and the Proposed Class*

Electronically FILED by
Superior Court of California,
County of Los Angeles
1/30/2025 1:03 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Cordon, Deputy Clerk

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES

| | |
|---|---|
| VIGEN TOVMASYAN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> TARGET CORPORATION, a corporation, and DOES 1-20, inclusive, <br><br> Defendants. | Case No. 25STCV02620 <br><br> <u>CLASS ACTION COMPLAINT</u> <br><br> 1. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq*. <br><br> 2. FALSE AND MISLEADING ADVERTISING IN VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17500, *et seq*. <br><br> 3. VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CIVIL CODE § 1750, *et. Seq*. <br><br> 4. BREACH OF EXPRESS WARRANTY <br><br> 5. UNJUST ENRICHMENT <br><br> 6. COMMON LAW FRAUD <br><br> 7. INTENTIONAL MISREPRESENTATION <br><br> 8. NEGLIGENT MISREPRESENTATION <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Vigen Tovmasyan ("Plaintiff" or "Tovmasyan"), each individually and each on behalf of all others similarly situated, bring this class action complaint against Target Corporation

1

CLASS ACTION COMPLAINT

("Defendant" and/or "Target") and Does 1 through 20, inclusive (collectively referred to herein as "Defendants") and alleges as follows:

### SUMMARY OF THE ACTION

1. This is a class action lawsuit brought on behalf of all purchasers of Good and Gather "No Preservatives" Dip Products (the **"Products"**), sold online and at retail locations throughout California and the United States.

2. Defendants falsely and deceptively advertise the Products as containing "No Artificial Colors, Flavors, or **Preservatives**" ("**Challenged Representation**"). However, contrary to the Products' Challenged Representation, as explained in detail below, the Products actually contain citric acid — a preservative ingredient used in food products.

3. Through falsely, misleadingly, and deceptively labeling the Products, Defendants seek to take advantage of consumers' desire for a truly premium products that are free from preservatives. Yet, Defendants do so at the expense of unwitting consumers, as well as Defendants' lawfully acting competitors, over whom Defendants maintain an unfair competitive advantage.

4. Plaintiff brings this action individually and in a representative capacity on behalf of similarly situated consumers who purchased the Products during the relevant Class Period (Class and/or Subclass defined infra), for dual primary objectives: *One*, Plaintiff seeks, on Plaintiff's individual behalf and on behalf of the Class/Subclass, a monetary recovery of the price premium Plaintiff and consumers overpaid for Products that should, but fails to, comport with the Challenged Representation (which may include, for example, damages, restitution, disgorgement, and/or any applicable penalties, fines, or punitive/exemplary damages) solely to the extent that the causes of action pled herein permit such recovery. *Two*, Plaintiff seeks, on his individual behalf and on behalf of the Class/Subclass, injunctive relief to stop Defendants' unlawful manufacture, marketing, and sale of the Products with the Challenged Representation to avoid or mitigate the risk of deceiving the public into believing that the Products conform to the Challenged Representation, by requiring Defendants to change their business practices, which may include one or more of the following: removal or modification of the Challenged Representation from the Product's labels, removal or modification of the Challenged Representation from the Product's advertising, modification of the

CLASS ACTION COMPLAINT

Product's formulation be it a change in ingredients or its sourcing and manufacturing processes, and/or discontinuance of the Product's manufacture, marketing, and/or sale.

5.    True and correct copies of the Products' labels are pictured below.

**Good & Gather Spinach Artichoke Dip**



CLASS ACTION COMPLAINT

**Good & Gather Cranberry Jalapeno Dip**



CLASS ACTION COMPLAINT

**Good & Gather Taco Dip**



CLASS ACTION COMPLAINT

**Good & Gather Tzatziki Yogurt Dip**



6.    Consumers are deceived by Defendants' labeling and advertising of the Products as containing "No Artificial Colors, Flavors, or Preservatives" believing that they are purchasing a preservative-free Product. Consumers rely on Defendants' labeling and advertising of the Products as containing "no preservatives" to be truthful and would not know that the Products actually contains a preservative.

7.    Reasonable consumers such as Plaintiff do not have specialized knowledge necessary to identify ingredients in the Products as being inconsistent with Defendants' advertised "No Artificial Colors, Flavors, or Preservatives."

8.    Defendants know that consumers are willing to pay more for natural, healthy products, and advertises the Products with the intention that consumers rely on the representation made on the front of the Products packaging that the Products have "No Artificial Colors, Flavors, or Preservatives."

6

CLASS ACTION COMPLAINT

9. By falsely labeling the Products as having "No Artificial Colors, Flavors, or Preservatives" Defendants have profited from consumers' preference for food products that are healthier or made free of preservatives.

**PARTIES**

10. **Plaintiff:** Plaintiff is, and at all times relevant hereto was, a citizen of California. Plaintiff purchased various flavors of the Products at different times during the Class Period, and most recently, he purchased the Spinach Artichoke Dip from a Target store in Los Angeles, California, in September of 2024. In making his purchase, Plaintiff relied upon Defendants' labeling and advertising claims, namely, the Challenged Representation label clearly printed on the front of the Products. These claims were prepared and approved by Defendants and their agents and disseminated statewide and nationwide, to encourage consumers to purchase the Products. If Plaintiff had known that the Products contained a preservative, then Plaintiff would not have purchased the Products, or he would have purchased it at a substantially lower price.

11. **Plaintiff's Future Harm:** Plaintiff would like to purchase the Products again only if he can be sure that Defendants are compliant with the state consumer protection laws. Plaintiff continues to see Defendants' Products in stores available for purchase, and desires to purchase it again if the representation regarding the Challenged Representation was in fact true. Since Plaintiff would like to purchase the Products again to obtain a food product that, as advertised, is truly preservative free, Plaintiff would purchase it again in the future—despite the fact that it was once marred by false advertising or labeling—as Plaintiff would reasonably, but incorrectly, assume the Products were improved (no longer contains preservative ingredients). In that regard, Plaintiff is an average consumer who is not sophisticated in the chemistry, manufacturing, and formulation of food products, such as the Products. Neither Plaintiff, nor reasonable consumers, have the requisite knowledge to accurately differentiate between ingredients that are "preservatives" or not. Accordingly, Plaintiff is at risk of reasonably, but incorrectly, assuming that Defendants fixed the formulation of the Products such that Plaintiff may buy it again, believing it to no longer be falsely advertised. Plaintiff is, therefore, currently and in the future deprived of the ability to rely on the

Malk & Pogo Law Group, LLP | 1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

7

Challenged Representation. Based on information and belief, the labeling of the Product purchased by Plaintiff is typical of the labeling of the Products purchased by members of the class.

12. **Defendant**. Target Corporation is a Minnesota corporation that maintains its principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. At all times during the class period, Defendant was the manufacturer, distributor, marketer, and seller of the Products. Target directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California.

13. The true names and capacities, whether individual, corporate, associate, or otherwise of certain manufacturers, distributors, and/or their alter egos sued herein as DOES 1 through 20 inclusive are presently unknown to Plaintiff who therefore sues these individuals and/or entities by fictitious names. Plaintiff will seek leave of this Court to amend the Complaint to show their true names and capacities when the same have been ascertained. Plaintiff is informed and believes and based thereon alleges that DOES 1 through 20 were authorized to do and did business in Los Angeles County. Plaintiff is further informed and believe and based thereon allege that DOES 1 through 20 were and/or are, in some manner or way, responsible for and liable to Plaintiff for the events, happenings, and consequences hereinafter set forth below.

### JURISDICTION AND VENUE

14. This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, § 10, because this case is a cause not given by statute to other trial courts.

15. Plaintiff has standing to bring this action pursuant to Business & Professions Code § 17200, *et seq*.

16. Venue is proper in this Court because the Plaintiff purchased the Products in Los Angeles County. Defendants receive substantial compensation from sales in Los Angeles County, and Defendants made numerous misrepresentations which had a substantial effect in Los Angeles County, including, but not limited to, label, point of purchase displays, and internet advertisements.

17. Upon information and belief, said misrepresentations originated and/or emanated from the State of California.

8

CLASS ACTION COMPLAINT

18.    Defendants and other out-of-state participants can be brought before this Court pursuant to the provisions of Code of Civil Procedure § 395.5.

19.    Defendants are subject to personal jurisdiction in California based upon sufficient minimum contacts which exist between Defendants and California. Defendants are authorized to do and are doing business in Los Angeles, California.

## **FACTUAL ALLEGATIONS**

### A.  Citric Acid

20.    Defendants advertise and display on the front labels of each of the Products that they contain "No Artificial Colors, Flavors, or Preservatives" thereby misleading reasonable consumers into believing that the Products are free from artificial preservatives. However, the Products contain a well-known and well-documented preservative, citric acid.

21.    Citric acid acts as a preservative when added to food products, including the Products at issue. Citric acid acts as a preservative in the Products regardless of the subjective purpose or intent for why Defendants added citric acid to the Products because citric acid acts as a preservative *even if* very low levels are contained in the Product.[1]

22.    The Food and Drug Administration ("FDA") defines a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. §101.22(a)(5).

23.    The FDA classifies and identifies citric acid as a preservative in its Overview of Food Ingredients, Additives, and Colors, on the FDA's website and provides examples of uses of preservatives like citric acid, including, in food. [2]

///

///

---

[1] *See* Doores, S., 1993. Organic acids. In: Davidson, P.M., Branen, A.L. (Eds.), *Antimicrobials in Foods*. Marcel Dekker, Inc., New York, pp. 95-136. http://base.dnsgb.com. ua/files/book/ Agriculture/Foods/Antimicrobials-in-Food. pdf

[2] *Overview of Food Ingredients, Additives & Colors, FOOD AND DRUG ADMINISTRATION, available at* https://web.archive.org/web/20220901032454/http://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors.

9

CLASS ACTION COMPLAINT

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

## Types of Food Ingredients

The following summary lists the types of common food ingredients, why they are used, and some examples of the names that can be found on product labels. Some additives are used for more than one purpose.

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| Preservatives | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

24.     Citric acid's classification as a preservative is further confirmed by a Warning Letter sent by the FDA to the manufacturer of Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites," in which the FDA proclaimed the "Pineapple Bites" and "Pineapple Bites with Coconut" products are further misbranded within the meaning of Section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservative ascorbic acid and *citric acid* but their labels fail to declare these preservatives with a description of their functions. 21 CFR 101.22."[3]

25.     The Agricultural Marketing Service of the United States Department of Agriculture ("USDA") has also recognized the use of citric acid as a preservative stating that "Citric acid has a wide variety of uses, some of which can provide preservative functions, primarily though lowering the pH of the food."[4]

26.     The USDA's Food Safety Inspection Service's "Guideline for Label Approval" states that "[s]ome common chemical preservatives include BHA, BHT, calcium propionate, citric acid, natamycin and sodium propionate."[5]

---

[3] *See* FDA label compliance website, https://www.fdalabelcompliance.com/letters/ucm228663.
[4] Citric Acid and Salts, UNITED STATES DEPARTMENT OF AGRICULTURE, available athttps://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.
[5] FSIS Guideline for Label Approval, UNITED STATES DEPARTMENT OF AGRICULTURE, available athttps://www.fsis.usda.gov/sites/default/files/media_file/documents/FSIS-GD-2023-0001.pdf

10

CLASS ACTION COMPLAINT

27.    Academic journals have also noted the use of citric acid as a preservative.[6] Indeed, "Citric acid acts as a preservative in many processed foods, keeping them fresh.  It does this by slowing or helping prevent the formation of bacteria, mold, yeast, and fungus."[7] "Today, citric acid is one of the most common and widely-used preservatives in the world[.]"[8]

28.    The Encyclopedia Britanica also classifies citric acid as a preservative because it has antioxidant properties.[9]

**B.  Defendants' Use of Citric Acid**

29.    Defendants use a synthetic form of citric acid that is derived from heavy chemical processing.[10] The citric acid used in the Products is commercially produced and is manufactured using a type of black mold called *Aspergillus niger*.[11] Chemical solvents such as n-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons are used to extract the citric acid that Defendants use in the Products from  *aspergillus niger* fermentation liquor. *See* 21 C.F.R § 173.280. The citric acid that Defendants use in the Products is produced through chemical solvent extraction and contains residues of those chemical solvents.

30.    An article published in the *Toxicology Reports Journal* explains that citric acid produced through aspergillus niger fermentation is artificial:  Citric acid naturally exists in fruits and vegetables. However, it is not    the    naturally    occurring citric acid, but the manufactured

---

[6] K. Kirimura, et al., Citric Acid, COMPREHENSIVE BIOTECHNOLOGY (SECOND EDITION)(2011), available at https://www.sciencedirect.com/science/article/abs/pii/B9780080885049001690?via%3Dihub; K.M.S. Islam, Use of citric acid in broiler diets, WORLD'S POULTRY SCIENCE JOURNALVOL.68,ISSUE 1(Feb. 21, 2012), available athttps://www.cambridge.org/core/journals/world-s-poultry-science-journal/article/abs/use-of-citric-acid-in-broiler-diets/DA15C2C1F90667525BF2414DF3BFF646 (  "Citric Acid (CA) is a weak organic acid which is a natural preservative and can add an acidic or sour taste to foods and soft drinks.").

[7] What is citric acid, and what is it used for?, MEDICAL NEWS TODAY (July 23, 2021), available athttps://www.medicalnewstoday.com/articles/citric-acid

[8] Citric Acid: One of the Most Important Preservatives in The World, FBCINDUSTRIES,INC. (Feb. 5, 2019), available athttps://fbcindustries.com/citric-acid-one-of-the-most-important-preservatives-in-the-world/

[9] Preservatives, BRITANICA, available at https://www.britannica.com/topic/food-additive/Preservatives#ref502211

[10] A. Hesham, Y. Mostafa & L. Al-Sharqi, Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates, 48 MYCOBIOLOGY 122, 123 (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7178817/ (emphasis added).

[11] *Id*; Pau Loke Show,et al., Overview of citric acid production from Aspergillus niger, FRONTIERS IN LIFE SCIENCE, 8:3, 271-283 (2015),available athttps://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653

11

CLASS ACTION COMPLAINT

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

citric acid (MCA) that is used extensively as a food additive. Approximately 99% of the world's production of MCA is carried out using the fungus *Aspergillus niger* since 1919. *Aspergilus niger* is a known allergen.[12]

31.    The Food and Drug Administration ("FDA") has also sent warning letters to companies stating that certain products labeled as "natural" are misbranded because they contain *artificial* citric acid as an ingredient. For example, on August 29, 2001, the FDA sent Hirzel Canning Company ("Hirzel") a warning letter regarding its canned tomato products. With respect to Hirzel's Chopped Tomatoes Onions & Garlic and Chopped Mexican Tomatoes & Jalapenos, the FDA stated that these products could not bear the "All Natural" claim on the label because the products contained a synthetic ingredient, citric acid.

32.    Consumption of manufactured citric acid has been associated with adverse health events like joint pain with swelling and stiffness, muscular and stomach pain, as well as shortness of breath.[13] The *Toxicology Reports Journal* article explains that "the potential presence of impurities or fragments from the Aspergillus niger in [manufactured citric acid] is a significant difference that may trigger deleterious effects when ingested."[14]

C.    <u>**Defendants Mislead Plaintiff and Reasonable Consumers, Who Relied on the Material and False Advertising Claims to their Detriment**</u>

33.    **Materiality.** The Challenged Representation is material to reasonable consumers, including Plaintiff, in deciding to buy the Products. Specifically, the composition of the Products containing no preservatives—is important to consumers and motivates them to buy the Product.

34.    **Reliance**. The Class, including Plaintiff, reasonably relied on the Challenged Representation in deciding to purchase the Products.

35.    **Consumers Lack Knowledge of Falsity**. Consumers, including Plaintiff, do not know, and have no reason to know, at the time of purchase, that the Products' Challenged Representation is false, misleading, deceptive, and unlawful. That is because consumers, including

---

[12] Iliana E. Sweis, et al., *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states:  A series of four case reports*, TOXICOLOGY REP.  5:808-812 (2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/Case 2:24-cv-03721-MWF-AJR
[13] *Id.*
[14] *Id.*

CLASS ACTION COMPLAINT

Plaintiff, do not work for Defendants and therefore have no personal knowledge of the actual ingredients used to make the Products or how those ingredients are made, including whether preservative ingredients are included. Additionally, average consumers do not have the specialized knowledge of a chemist or product-developer. Thus, reasonable consumers, like Plaintiff, cannot discern from the Products' ingredient disclosures whether certain ingredients, are preservatives. Furthermore, reasonable consumers, like Plaintiff, do not ordinarily review information on the back or side panels of a consumer product's packaging, like the Products' packaging, particularly dense, fine-print ingredient disclosures, or review such information on websites. Indeed, studies show that only approximately 7.7% to 11.6% of people even look at the side or back labels of consumer goods, such as ingredient lists, before they buy it.[15]

---

[15] Grunert, Klaus, et. al, *Nutrition knowledge, and use and understanding of nutrition information on food labels among consumers in the UK*, 55 Appetite 177, at 179-181 (2010) available at https://reader.elsevier.com/reader/sd/pii/S0195666310003661?token=95E4146C1BB7D7A7C9A4 87F22F0B445BD44499550086E04870765EBE116ED32DBFE3795E60B69C75831563CD1BC6 655A&originRegion=us-east-1&originCreation=20220720162546 (consumer purchasing behavior study using in-store observation and interview data collection methodology to realistically estimate the degree consumers use nutritional information (found on side/back panels of food product labels and packaging), finding: (1) only **11.6% of respondents**, who looked at a product and placed it in their shopping cart, **were actually observed looking at the side/back panels of its packaging or labels** (panels other than the front panel) before placing it in the cart; (2) of those who looked at the side/back panels, only 31.8% looked at it the product "in detail" (i.e., 3.7% of respondents who looked at the product, looked at side/back panels in detail)); and (3) the **respondents self-reported frequency of reviewing side/back panels** (for nutritional information) **is overreported by 50%** when the in-store interview data and observational data are compared); Grunert, Klaus, et. al, *Use and understanding of nutrition information on food labels in six European countries*, 18(3) Journal of Public Health 261, 261, 263, 266 (2010), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2967247/ (last accessed July 20, 2022) (consumer purchasing behavior study using in-store observation and interview data collection methodology to evaluate whether people look at food labels before buying them, where they looked, and how long they looked, finding: (1) respondents spent, on average, approximately 35 seconds, per product, on products they bought; and (2) 62.6% of respondents looked at the front packaging, and **only 7.7% looked elsewhere (side/back panels) on the packaging**, for products they bought); Benn, Yael, et al., *What information do consumers consider and how do they look for it, when shopping for groceries online*, 89 Appetite 265, 265, 270 (2015), available at https://www.sciencedirect.com/science/article/pii/S0195666315000422#bib0060 (last accessed October 31, 2024) (consumer purchasing behavior study using online eye-movement tracking and recordation, finding: (1) once on the product webpages, respondents tend to look at the pictures of products, rather than examine detailed product information; and (2) by comparison to pictures of products where 13.83-19.07% of respondents fixated, far less fixated on subsidiary information: 4.17% of respondents looked at nutrition information, 3.30% ingredients, 2.97% allergy information, and 0.09% recycling information for example).

Malk & Pogo Law Group, LLP | 1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

13

CLASS ACTION COMPLAINT

36.    The average consumer spends generally not more than 13 seconds to make an in-store purchasing decision.[16] That decision is heavily based upon the product's front labeling because consumers do not have time to review and read every portion of the label and inspect in detail the rear label which depicts in small print the ingredients.

a. **Defendants' Knowledge**. Defendants knew, or should have known, that the Challenged Representation was false, misleading, deceptive, and unlawful, at the time that Defendants manufactured, marketed, advertised, labeled, and sold the Products using the Challenged Representation to Plaintiff and the Class. Defendants intentionally and deliberately used the Challenged Representation, alongside their massive marketing campaign and brand strategy, to cause Plaintiff and similarly situated consumers to buy the Products believing that the Challenged Representation is true. **Knowledge of Falsity.** Defendants marketed the Products with the Challenged Representation, but Defendants opted to formulate and manufacture them in a manner that does not conform to this representation. Specifically, Defendants advertised and labeled the Products with the Challenged Representation, but, instead of using only non-preservative ingredients, Defendants chose to make the Products with citric acid, a well-documented preservative.

b. **Knowledge of Reasonable Consumers' Perception.** Defendants knew, or should have known, that the Challenged Representation would lead reasonable consumers into believing that the Products were preservative free—i.e., the Products do not contain preservative ingredients. Not only have Defendants labeled the Products with the Challenged Representation and executed a long-standing brand strategy and advertising campaign to identify the Products with the Challenged Representation, but Defendants also have an obligation under section 5 of the Federal Trade Commission Act, codified at 15 U.S.C. §§ 45, to evaluate its marketing claims from the perspective of the reasonable consumer. That means Defendants were statutorily obligated to consider whether the Challenged Representation, be it in isolation or conjunction with its marketing campaign, would mislead reasonable consumers into believing that the Products were made of only non-preservative ingredients. Thus, Defendants either knew the Challenged Representation was misleading before they marketed the Products to the Class, including Plaintiff, or Defendants would have known that it was deceptive had Defendants complied with its statutory obligations.

c. **Knowledge of Materiality.** Defendants knew or should have known that the Challenged Representation is material to consumers. *First*, manufacturers and marketers, like Defendants, generally reserve the front primary display panel of labels on consumer products for the most important and persuasive information, which they believe will motivate consumers to buy the products. Here, the conspicuousness of the Challenged Representation on the Products' labels

---

[16]    Randall Beard, *Make the Most of Your Brand's 20-Second Window*, NIELSEN (Jan. 13, 2015), https://www.nielsen.com/us/en/insights/article/2015/make-the-most-of-your-brands-20-second-window/ (citing *Shopping Takes Only Seconds… In-Store and Online*, EHRENBERG-BASS INSTITUTE OF MARKETING SCIENCE (2015)) (last visited 11/04/2024).

14

CLASS ACTION COMPLAINT

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

demonstrate Defendants' awareness of its importance to consumers and Defendants' understanding that consumers prefer and are motivated to buy products that conform to the Challenged Representation. **Second**, manufacturers and marketers repeat marketing claims to emphasize and characterize a brand or product line, shaping the consumers' expectations, because they believe those repeated messages will drive consumers to buy the Products. Here, the constant, unwavering use of the Challenged Representation on the Products, advertisements, and throughout Defendants' marketing campaign, evidence Defendants' awareness that the falsely advertised Product-attribute is important to consumers. It also evidences Defendants' intent to convince consumers that the Products conform to the Challenged Representation and, ultimately, drive sales.

d. **Defendants Continued Deception, Despite Their Knowledge.** Defendants, as the manufacturers and marketers of the Products, had exclusive control over the Challenged Representation's inclusion on the Products' labels, and advertisements—i.e., Defendants readily and easily could have stopped using the Challenged Representation to sell the Products. However, despite Defendants' knowledge of the Challenged Representation's falsity, and Defendants' knowledge that consumers reasonably rely on the Challenged Representation in deciding to buy the Products, Defendants deliberately chose to market the Products with the Challenged Representation thereby misleading consumers into buying or otherwise overpaying for the Products. Thus, Defendants knew, or should have known, at all relevant times, that the Challenged Representation misleads reasonable consumers, such as Plaintiff, into buying the Products to attain the product-attributes that Defendants falsely advertised and warranted. Indeed, notwithstanding Plaintiff's demand to Defendants to stop misleading consumers with the Challenged Representation, Defendants have continued to market the Products using the Challenged Representation.

37.     By letter dated November 26, 2024, Plaintiff advised Defendants of their false and misleading claims pursuant to California Civil Code Section 1782, subdivision (a) regarding Defendants' use of citric acid – a preservative ingredient. Plaintiff has provided Defendants with notice of their violations of the CLRA pursuant to Civil Code § 1782(a).

D.  **No Adequate Remedy at Law**

38.     **No Adequate Remedy at Law.** Plaintiff and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

a. **Broader Statutes of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations under the FAL and CLRA. In addition, the statutes of limitations vary for certain states' laws for breach of warranty and unjust enrichment/restitution, between approximately 2 and 6 years. Thus, California Subclass members who purchased the Products more than 3 years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.  Similarly, Nationwide Class members who purchased the Products prior to the furthest reach-back under the statute of limitations for breach

CLASS ACTION COMPLAINT

Malk & Pogo Law Group, LLP   |   1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

of warranty, will be barred from recovery if equitable relief were not permitted for restitution/unjust enrichment.

b. **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes, for example, Defendants' overall unfair marketing scheme to promote and brand the Products with the Challenged Representation, across a multitude of media platforms, including the Product's labels, over a long period of time, in order to gain an unfair advantage over competitor products and to take advantage of consumers' desire for products that comport with the Challenged Representation. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representation and omission made on the type of products at issue). Thus, Plaintiff and Class members may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiff (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct). Similarly, unjust enrichment/restitution is broader than breach of warranty. For example, in some states, breach of warranty may require privity of contract or pre-lawsuit notice, which are not typically required to establish unjust enrichment/restitution. Thus, Plaintiff and Class members may be entitled to recover under unjust enrichment/restitution, while not entitled to damages under breach of warranty, because they purchased the products from third-party retailers or did not provide adequate notice of a breach prior to the commencement of this action.

c. **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief is appropriate on behalf of Plaintiff and members of the Class because Defendants continue to misrepresent the Products with the Challenged Representation. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures is necessary to dispel the public misperception about the Products that has resulted from years of Defendants' unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' Challenged Representation is not true and providing accurate information about the Product's true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front label concerning the Products' true nature. An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiff is *currently* unable to accurately quantify the damages caused by Defendants' future harm, because discovery and Plaintiff's investigation have not yet completed, rendering injunctive relief all the more necessary. For example, because the court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, their respective purchasing practices, prices of past/future Products sales, and quantities of past/future Product sales.

16

CLASS ACTION COMPLAINT

d. **Public Injunction.** Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

e. **California vs. Nationwide Class Claims**. Violation of the UCL, FAL, and CLRA are claims asserted on behalf of Plaintiff and the California Subclass against Defendant, while breach of warranty and unjust enrichment/restitution are asserted on behalf of Plaintiff and the Nationwide Class. Dismissal of farther-reaching claims, such as restitution, would bar recovery for non-California members of the Class. In other words, legal remedies available or adequate under the California-specific causes of action (such as the UCL, FAL, and CLRA) have no impact on this Court's jurisdiction to award equitable relief under the remaining causes of action asserted on behalf of non-California putative class members.

## CLASS ALLEGATIONS

39.    **Class Definition**. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and all others similarly situated, and as members of the Classes defined as follows:

> All persons or entities that, within the applicable statute of limitations periods, purchased the Products in the United States, displaying the Challenged Representation on the Products' labels, for purposes other than resale ("**Nationwide Class**"); and

> All persons or entities that, within four years prior to the filing of this Complaint through present, purchased the Products in California, displaying the Challenged Representation on the Products' labels, for purposes other than resale ("**California Subclass**")

("Nationwide Class" and "California Subclass," collectively, "**Class**").

40.    **Class Definition Exclusions.** Excluded from the Class are: (i) Defendants, their assigns, successors, and legal representatives; (ii) any entities in which Defendants have controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

41.    **Reservation of Rights to Amend the Class Definition.** Plaintiff reserves the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

CLASS ACTION COMPLAINT

42. **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the State of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

43. **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

a. Whether Defendants engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;

b. Whether Defendants' conduct of advertising and selling the Products as being preservative free, creating the reasonable assumption that the Products do not contain any preservative ingredients, when the Products contains citric acid, constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code section 1750, *et seq.*

c. Whether Defendants used deceptive representation in connection with the sale of the Products in violation of Civil Code section 1750, *et seq.*;

d. Whether Defendants represented that the Products have characteristics or quantities that they do not have in violation of Civil Code section 1750, *et seq.*;

e. Whether Defendants advertised the Products with intent not to sell it as advertised in violation of Civil Code section 1750, *et seq.*;

f. Whether Defendants' labeling and advertising of the Products is untrue or misleading in violation of Business and Professions Code section 17500, *et seq.*;

g. Whether Defendants knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of Business and Professions Code section 17500, *et seq.*;

h. Whether Defendants' conduct is an unfair business practice within the meaning of Business and Professions Code section 17200, *et seq.*

i. Whether Defendants' conduct is a fraudulent business practice within the meaning of Business and Professions Code section 17200, *et seq.*

j. Whether Defendants' conduct is an unlawful business practice within the meaning of Business and Professions Code section 17200, *et seq.*;

k. Whether Plaintiff and the Class paid more money for the Products than they actually received;

18

CLASS ACTION COMPLAINT

l.      How much more money Plaintiff and the Class paid for the Products than they actually received;

m.      Whether Defendants' conduct constitutes breach of warranty;

n.      Whether Plaintiff and the Class are entitled to injunctive relief; and

o.      Whether Defendants were unjustly enriched by its unlawful conduct.

44.      **Typicality**: Plaintiff's claims are typical of the claims of the Class Members he seeks to represent because Plaintiff, like the Class Members, purchased Defendants' misleading and deceptive Products. Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendants' conduct. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

45.      **Adequacy**: Plaintiff is an adequate representative of the Class he seeks to represent because his interests do not conflict with the interests of the Class Members Plaintiff seeks to represent. Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

46.      **Superiority and Substantial Benefit:** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons

a.      The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

b.      Absent a Class, the members of the Class will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy its ill-gotten gains;

c.      Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

CLASS ACTION COMPLAINT

d.    When the liability of Defendants has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

e.    This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant.

47.    **Inconsistent Rulings.** Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

48.    **Injunctive/Equitable Relief.** The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

49.    **Manageability.** Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

<u>**COUNT ONE**</u>

**Violation of California Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

**(*On Behalf of the California Subclass*)**

50.    **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

51.    **California Subclass.** This cause of action is brought pursuant to Business and Professions Code Section 17200, *et seq.*, on behalf of Plaintiff and a California Subclass who purchased the Products within the applicable statute of limitations.

52.    **The UCL.** California Business & Professions Code, sections 17200, *et seq.* (the **"UCL"**) prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

CLASS ACTION COMPLAINT

53. **False Advertising Claims.** Defendants, in their labeling and advertising of the Products, made false and misleading statements and fraudulent omissions regarding the quality and characteristics of the Products—specifically, the Challenged Representation (i.e., that the Products contain no preservatives) — despite the fact the Products contain citric acid, a well-documented preservative. Such claim and omission appear on the front labels of the Products, which are sold at retail stores, point-of-purchase displays, and online.

54. **Defendants' Deliberately False and Fraudulent Marketing Scheme.** Defendants do not have any reasonable basis for the claims about the Products made in Defendants' advertising and on Defendants' labeling because the Products contain citric acid, a well-documented preservative. Defendants knew and know that the Products contain citric acid, yet Defendants intentionally advertise and market the Products to cause reasonable consumers to believe that the Products are preservative free.

55. **False Advertising Claims Cause Purchase of Product.** Defendants' labeling and advertising of the Products led to, and continue to lead to, reasonable consumers, including Plaintiff, believing that the Products were preservative free, to the exclusion of preservative ingredients.

56. **Injury In Fact.** Plaintiff and the California Subclass have suffered injury in fact and have lost money or property as a result of and in reliance upon Defendants' Challenged Representation—namely Plaintiff and the California Subclass lost the purchase price for the Products they bought from Defendants.

57. **Conduct Violates the UCL.** Defendants' conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and

CLASS ACTION COMPLAINT

Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

58. **No Reasonably Available Alternatives/Legitimate Business Interests.** Defendants failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

59. **Business Practice.** All of the conduct alleged herein occurred and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendants voluntarily alter its conduct or Defendants are otherwise ordered to do so.

60. **Injunction.** Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiff and the members of the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of labeling and advertising the sale and use of the Products. Likewise, Plaintiff and the members of the California Subclass seek an order requiring Defendants to disclose such misrepresentation, and to preclude Defendants' failure to disclose the existence and significance of said misrepresentation.

61. **Causation/Damages.** As a direct and proximate result of Defendants' misconduct in violation of the UCL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

62. **Punitive Damages.** Plaintiff seeks punitive damages pursuant to this cause of action for violation of the UCL on behalf of Plaintiff and the California Subclass. Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendants'

CLASS ACTION COMPLAINT

Malk & Pogo Law Group, LLP | 1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

misconduct is malicious as Defendants acted with the intent to cause Plaintiff and consumers to pay for a Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendants were, at all times, aware of the probable dangerous consequences of their conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendants' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendants' misconduct is fraudulent as Defendants intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants.

### "Unfair" Prong

63.    **Unfair Standard.** Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal. App. 4th 1394, 1403 (2006).

64.    **Injury.** Defendants' actions of mislabeling the Products with the Challenged Representation do not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive a product commensurate with their reasonable expectations, overpay for the Products, and receive a product of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendants' deceptive labeling and/or advertising of the Products. Accordingly, the injuries caused by Defendants' deceptive labeling and advertising outweigh any benefits.

65.    **Balancing Test.** Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the Defendants' conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).

23

CLASS ACTION COMPLAINT

66.    **No Utility.** Here, Defendants' conduct of labeling the Products as containing "No Preservatives"—when the Products contains citric acid, has no utility and financially harms purchasers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of harm.

67.    **Legislative Declared Policy.** Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007).

68.    **Unfair Conduct.** Defendants' labeling and advertising of the Products, as alleged herein, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendants knew or should have known of their unfair conduct. Defendants' misrepresentation constitutes an unfair business practice within the meaning of California Business and Professions Code Section 17200.

69.    **Reasonably Available Alternatives.** There existed reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representation.

70.    **Defendants' Wrongful Conduct.** All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

71.    **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practices of labeling the Products with the Challenged Representation.

72.    **Causation/Damages.** Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid for Products that were supposedly preservative free, but instead purchased Products that contain citric acid, a well-documented preservative. Plaintiff and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiff seeks damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

**"Fraudulent" Prong**

73.    **Fraud Standard.** The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

74.    **Fraudulent & Material Challenged Representation.** Defendants used the Challenged Representation with the intent to sell the Products to consumers, including Plaintiff and the California Subclass. The Challenged Representation is false, and Defendants knew or should have known of its falsity. The Challenged Representation is likely to deceive consumers into purchasing the Products because it is material to the average, ordinary, and reasonable consumer.

75.    **Fraudulent Business Practice.** As alleged herein, the misrepresentation by Defendants constitutes a fraudulent business practice in violation of California Business & Professions Code Section 17200.

76.    **Reasonable and Detrimental Reliance.** Plaintiff and the California Subclass reasonably and detrimentally relied on the material and false Challenged Representation to their detriment in that they purchased the Products.

77.    **Reasonably Available Alternatives.** Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representation. Alternatively, they could have refrained from including citric acid as an ingredient within the Products.

78.    **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

79.    **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of labeling the Products with the Challenged Representation.

80.    **Causation/Damages.** Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unfair conduct. Plaintiff and the California Subclass

CLASS ACTION COMPLAINT

paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid for a Products that was supposedly contained no preservatives, but instead purchased Products that contain citric acid, a well-documented preservative. Plaintiff and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiff seeks damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

**"Unlawful" Prong**

81. **Unlawful Standard.** The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

82. **Violations of CLRA and FAL.** Defendants' labeling of the Products, as alleged herein, violates California Civil Code sections 1750, *et seq.* (the "**CLRA**") and California Business and Professions Code sections 17500, *et seq.* (the "**FAL**") as set forth below in the sections regarding those causes of action.

83. **Additional Violations.** Defendants' conduct in making the false representation described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to its competitors. This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendants' misrepresentation of material facts, as set forth herein, violates California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

84. **Unlawful Conduct.** Defendants' labeling and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendants knew or should have known of its unlawful conduct

85. **Reasonably Available Alternatives.** Defendants had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein.

26

CLASS ACTION COMPLAINT

Defendants could have refrained from labeling the Products with the Challenged Representation and/or omitting the use of preservative ingredients within the Products.

86. **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

87. **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ its practice of false and deceptive advertising of the Product.

88. **Causation/Damages.** Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid for a Products that was supposedly preservative free, but instead purchased Products that contain citric acid – a preservative ingredient. Plaintiff and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiff seeks damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT TWO

### Violation of California False Advertising Law

### (Cal. Bus. & Prof. Code §§ 17500, *et seq.*)

### (*On Behalf of the California Subclass*)

89. **Incorporation by reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

90. **California Subclass.** Plaintiff brings this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

91. **FAL Standard.** The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]"

92. **False & Material Challenged Representation Disseminated to Public.** Defendants violated section 17500 when they advertised and marketed the Products through the unfair,

27

CLASS ACTION COMPLAINT

deceptive, untrue, and misleading Challenged Representation disseminated to the public through the Products' labeling, marketing, and advertising. This representation was false because the Products does not conform to it. The representation was material because it is likely to mislead a reasonable consumer into purchasing the Products.

93. **Knowledge.** In making and disseminating the representation alleged herein, Defendants knew or should have known that the representation was untrue or misleading, and acted in violation of § 17500.

94. **Intent to Sell.** Defendants' Challenged Representation was specifically designed to induce reasonable consumers, like Plaintiff and the California Subclass, to purchase the Products.

95. **Causation/Damages.** As a direct and proximate result of Defendants' misconduct in violation of the FAL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendants' misconduct prevent ongoing and future harm that will result.

96. **Punitive Damages.** Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendants' misconduct is malicious as Defendants acted with the intent to cause Plaintiff and consumers to pay for a Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendants were aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendants' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their

CLASS ACTION COMPLAINT

rights. Defendants' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants.

## COUNT THREE

### Violation of California Consumers Legal Remedies Act

### (Cal. Civ. Code §§ 1750, *et seq*.)

### (*On Behalf of the California Subclass*)

97. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

98. **California Subclass.** Plaintiff brings this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

99. **CLRA Standard.** The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful.

100. **Goods/Services.** The Products are a "good," as defined by the CLRA in California Civil Code §1761(a).

101. **Defendants.** Defendants are a "person," as defined by the CLRA in California Civil Code §1761(c).

102. **Consumers.** Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code §1761(d).

103. **Transactions.** The purchase of the Products by Plaintiff and members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code § 1761(e).

104. **Violations of the CLRA.** Defendants violated the following sections of the CLRA by selling the Products to Plaintiff and the California Subclass through the false, misleading, deceptive, and fraudulent Challenged Representation.

CLASS ACTION COMPLAINT

a. Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [it] do[es] not have."

b. Section 1770(a)(7) by representing that the Products "[is] of a particular standard, quality, or grade . . . [when] [it is] of another."

c. Section 1770(a)(9) by advertising the Products "with [the] intent not to sell [it] as advertised."

105. **Knowledge.** Defendants' uniform and material representation regarding the Products was likely to deceive, and Defendants knew or should have known that their representation was untrue and misleading.

106. **Malicious.** Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Plaintiff, to increase the sale of the Products.

107. **Plaintiff Could Not Have Avoided Injury.** Plaintiff and members of the California Subclass could not have reasonably avoided such injury. Plaintiff and members of the California Subclass were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Plaintiff and members of the California Subclass would not have purchased the Products and/or would have purchased it on different terms had they known the truth.

108. **Causation/Reliance/Materiality.** Plaintiff and the California Subclass suffered harm as a result of Defendants' violations of the CLRA because they relied on the Challenged Representation in deciding to purchase the Products. The Challenged Representation was a substantial factor. The Challenged Representation was material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

109. **Section 1782(d)—Prelitigation Demand/Notice.** Pursuant to California Civil Code, section 1782, more than thirty days prior to the filing of this complaint, on or around November 26 of 2024, Plaintiff's counsel, acting on behalf all members of the Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Target Corporation at its headquarters and principal place of business (1000 Nicollet Mall Minneapolis, MN 55403), and its

CLASS ACTION COMPLAINT

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

registered agent addresses (1010 Dale St. N St. Paul, MN 55117 and 330 N. Brand Blvd., Suite 700 Glendale CA 91203).

110. **Causation/Damages.** As a direct and proximate result of Defendants' misconduct in violation of the CLRA, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies.

111. **Injunction.** Given that Defendants' conduct violated California Civil Code section 1780, Plaintiff and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendants' violations of the CLRA and to dispel the public misperception generated, facilitated, and fostered by Defendants' false advertising campaign. Plaintiff has no adequate remedy at law. Without equitable relief, Defendants' unfair and deceptive practices will continue to harm Plaintiff and the California Subclass. Accordingly, Plaintiff seeks an injunction to enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to section 1780(a)(2), and otherwise requires Defendants to take corrective action necessary to dispel the public misperception engendered, fostered, and facilitated through Defendants' deceptive labeling of the Products with the Challenged Representation

112. **Punitive Damages.** Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendants' misconduct is malicious as Defendants acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendants were, at all times, aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendants' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people

31

CLASS ACTION COMPLAINT

would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendants' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants. Accordingly, Plaintiff seeks an award of punitive damages against Defendants.

## COUNT FOUR

### Breach of Warranty

#### (*On Behalf of the Nationwide Class and California Subclass*)

113.   **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

114.   **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products within the applicable statute of limitations.

115.   **Express Warranty.** By advertising and selling the Products at issue, Defendants made promises and affirmations of fact on the Products' labeling, and through their marketing and advertising, as described herein. This labeling and advertising constitute express warranties and became part of the basis of the bargain between Plaintiff and members of the Class and Defendants. Defendants purport, through the Products' labeling and advertising, to create express warranties that the Products, among other things, conforms to the Challenged Representation.

116.   **Implied Warranty of Merchantability.** By advertising and selling the Products at issue, Defendants, merchants of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' labeling, and through their marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiff and members of the Class and Defendants—to wit, that the Products, among other things, conform to the Challenged Representation.

CLASS ACTION COMPLAINT

117.   **Breach of Warranty.** Contrary to Defendants' express warranties, the Products do not conform to the Challenged Representation and, therefore, Defendants breached their warranties about the Products and its qualities.

118.   **Causation/Remedies.** As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

119.   **Punitive Damages.** Plaintiff seeks punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiff and the Class. Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendants' misconduct is malicious as Defendants acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendants was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendants' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendants' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants.

///

CLASS ACTION COMPLAINT

## COUNT FIVE

### Unjust Enrichment/Restitution

### (*On Behalf of the Nationwide Class and California Subclass*)

120.   **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

121.   **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products within the applicable statute of limitations.

122.   **Plaintiff/Class Conferred a Benefit.** By purchasing the Products, Plaintiff and members of the Class conferred a benefit on Defendants in the form of the purchase price of the Products.

123.   **Defendants' Knowledge of Conferred Benefit.** Defendants had knowledge of such benefit and Defendants appreciated the benefit because, were consumers not to purchase the Products, Defendants would not generate revenue from the sales of the Products.

124.   **Defendants' Unjust Receipt Through Deception.** Defendants' owing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants' fraudulent, misleading, and deceptive representation and omission.

125.   **Causation/Damages.** As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendants' conduct to prevent ongoing and future harm that will result.

126.   **Punitive Damages.**  Plaintiff seeks punitive damages pursuant to this cause of action for unjust enrichment on behalf of Plaintiff and the Class. Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct

34

CLASS ACTION COMPLAINT

warranting an award of punitive damages as permitted by law. Defendants' misconduct is malicious as Defendants acted with the intent to cause Plaintiff and consumers to pay for a Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendants were aware of the probable dangerous consequences of their conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendants' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendants' misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants.

## COUNT SIX

### Common Law Fraud

### (*On Behalf of the Nationwide Class and California Subclass*)

127. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

128. **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products within the applicable statute of limitations.

129. Defendants have willfully, falsely, and knowingly labeled and marketed the Products with the Challenged Representation. However, the Products contain citric acid – a well documented preservative ingredient. Defendants have misrepresented the quality of ingredients contained in the Products.

130. Defendants' misrepresentations are and were material (i.e., the type of misrepresentations to which a reasonable person would attach importance and would be induced to act thereon in making his or her purchase decision), because they relate to the quality of food products purchased and consumed.

35

CLASS ACTION COMPLAINT

131.    Defendants knew of, or showed reckless disregard for, the fact that the Products contained a preservative ingredient.

132.    Defendants intended for Plaintiff and the Class to rely on these representations, as evidenced by Defendants' intentional labeling and marketing of the Products with the Challenged Representation.

133.    Plaintiff and the Class have reasonably and detrimentally relied on Defendants' misrepresentations when purchasing the Products and, had they known the truth, they would not have purchased the Products or would have paid significantly less for the Products.

134.    Therefore, as a direct and proximate result of Defendants' fraud, Plaintiff and members of the Class have suffered injury in fact.

**COUNT SEVEN**

**Intentional Misrepresentation**

***(On Behalf of the Nationwide Class and California Subclass)***

135.    **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

136.    **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products within the applicable statute of limitations.

137.    Defendants have intentionally labeled and marketed the Products with the Challenged Representation. However, the Products contain numerous citric acid. Defendants have misrepresented the quality of ingredients contained in the Products.

138.    Defendants' misrepresentations regarding the Products are material to a reasonable consumer, as they relate to the quality of product received by consumers. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making his or her purchase decision.

139.    At all relevant times when such misrepresentations were made, Defendants knew or should have known that the representations were misleading.

36

CLASS ACTION COMPLAINT

140. Defendants intended for Plaintiff and the Class to rely on the front labeling and marketing of the Products', as evidenced by Defendants' intentional manufacturing, marketing, labeling, and selling of Products with preservative ingredients.

141. Plaintiff and members of the Class reasonably and justifiably relied on Defendants' intentional misrepresentations when purchasing the Products, and had they known the truth, they would not have purchased the Products or would have purchased them at significantly lower prices

142. As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiff and members of the Class have suffered injury in fact.

**COUNT EIGHT**

**Negligent Misrepresentation**

***(On Behalf of the Nationwide Class and California Subclass)***

143. **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

144. **Nationwide Class & California Subclass.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products within the applicable statute of limitations.

145. Defendants have negligently labeled and marketed the Products with the Challenged Representation. However, the Products contain citric acid. Defendants have misrepresented the quality of ingredients contained in the Products.

146. Defendants' misrepresentations regarding the Products are material to a reasonable consumer, as they relate to the quality of product received by consumers. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making his or her purchase decision.

147. At all relevant times when such misrepresentations were made, Defendants knew or should have known that the representations were misleading.

148. Defendants intended for Plaintiff and the Class to rely on the front labeling and marketing of the Products', as evidenced by Defendants' intentional manufacturing, marketing, labeling, and selling of Products preservative ingredients.

CLASS ACTION COMPLAINT

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204 Glendale, CA 91205

149.    Plaintiff and members of the Class reasonably and justifiably relied on Defendants' intentional misrepresentations when purchasing the Products, and had they known the truth, they would not have purchased the Products or would have purchased them at significantly lower prices.

150.    As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiff and members of the Class have suffered injury in fact.

## PRAYER FOR RELIEF

151.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as follows:

a.  **Certification:** For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's Counsel as Class Counsel, consistent with applicable law;

b.  **Declaratory Relief:** For an order declaring that Defendants' conduct violates the statutes and laws referenced herein, consistent with applicable law and pursuant to only those causes of action so permitted;

c.  **Injunction:** For an order requiring Defendants to change their business practices to prevent or mitigate the risk of the consumer deception and violations of law outlined herein. This includes, for example, orders that Defendants immediately cease and desist from selling the unlawful Products in violation of law; that enjoin Defendants from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; that require Defendants to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendants' unlawful conduct; and/or that require Defendants to take all further and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted;

d.  **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class, consistent with applicable law and pursuant to only those causes of action so permitted;

e.  **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted;

f.  **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted;

g.  **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; and

38

CLASS ACTION COMPLAINT

h. **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

152. Plaintiff hereby demands a trial by jury on all issues and causes of action so triable.

**MALK & POGO LAW GROUP, LLP**

Valter Malkhasyan, Esq.
Erik Pogosyan, Esq.

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT

# EXHIBIT B

Daniel Lammie (Bar No. 345838)
HAYNES AND BOONE, LLP
112 East Pecan Street, Suite 2400
San Antonio, TX 78205
Telephone: (210) 978-7000
Facsimile: (210) 978-7450
Daniel.lammie@haynesboone.com

Letitia Johnson-Smith (Bar No. 355642)
HAYNES AND BOONE, LLP
600 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001
Letitia.johnson-smith@haynesboone.com

Brent R. Owen (Bar No. 45068) (admitted *pro hac vice*)
HAYNES AND BOONE, LLP
675 15th Street, Suite 2200
Denver, CO 80202
T: (303) 382-6200
F: (303) 382-6210
Brent.owen@haynesboone.com

Attorneys for Defendant
TARGET CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIGEN TOVMASYAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TARGET CORPORATION, a corporation, and DOES 1-20, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-02314-MRA-KS<br><br>Assigned to District Judge:<br>Hon. Monica Ramirez Almadani<br><br>**DEFENDANT TARGET CORPORATION'S RESPONSES TO PLAINTIFF VIGEN TOVMASYAN'S INTERROGATORIES, SET ONE** |

labeling and packaging iterations" address changes and issues outside the claims and defenses in this case.

**RESPONSE TO INTERROGATORY NO. 1:**

Subject to the foregoing objections, Target responds as follows:

(1)    Cranberry and Jalapeno Dip, DPCI No. 216330096, Dates: 03/09/21, 07/12/24;

(2)    Spinach and Artichoke Dip, DPCI No. 216330138, Dates: 07/14/20, 12/08/22, 10/31/2024;

(3)    Taco Dip, DPCI No. 216330052, Dates: 07/14/20, 08/04/21, 02/28/24, 07/11/24;

(4)    Tzatziki Yogurt Dip, DPCI No. 216330054, Date: 12/19/21.

**INTERROGATORY NO. 2:**

Identify sales channels (e.g., direct to consumer, by telephone, retail outlet, internet, Amazon Storefront, websites, mail order, or other means) through which the PRODUCTS were sold to consumers in California during the CLASS PERIOD.

**RESPONSE TO INTERROGATORY NO. 2:**

The Products were sold in California online at Target.com and in Target stores exclusively, during the Class period.

**INTERROGATORY NO. 3:**

Identify YOUR record-keeping systems for the PRODUCTS during the CLASS PERIOD, including YOUR systems for: (1) advertisements; (2) labels and packaging schematics; (3) suppliers; (4) manufacturing specifications; (5) production costs; (6) customer relations management; (7) formulation; (8) implementation, performance, and efficacy of advertising and marketing campaigns, including business analytics data; (9) inventory and warehousing; and (10) sales.

**OBJECTION TO INTERROGATORY NO. 3:**

Target objects to Interrogatory No. 3 to the extent it seeks to misclassify Target's involvement in this lawsuit as the manufacturer when, in fact, Target is

- 3 -

## VERIFICATION

I, Courtney Jacobson, am a _Sr FSQR Scientist_ for Target Corporation, and I am authorized to make this Verification for and on behalf of Defendant Target Corporation in the within action.

I have read the foregoing document, entitled **DEFENDANT TARGET CORPORATION'S RESPONSES TO PLAINTIFF VIGEN TOVMASYAN'S INTERROGATORIES, SET ONE**, I am familiar with its contents, and I am informed and believe, and on that basis allege, that the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 22 , 2025, at_____1:12 pm_____.


_Courtney Jacobson_
Courtney Jacobson
Target Corporation

VERIFICATION

# EXHIBIT C

**MALK & POGO LAW GROUP, LLP**
Valter Malkhasyan (SBN 348491)
*valter@malkpogolaw.com*
Erik Pogosyan (SBN 345650)
*erik@malkpogolaw.com*
1241 S. Glendale Ave. Suite 204
Glendale, CA 91205
Tel: (818) 484-5204
Fax: (818) 824-5144

*Counsel for Plaintiff Vigen Tovmasyan and the Proposed Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIGEN TOVMASYAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TARGET CORPORATION, a corporation, and DOES 1-20, inclusive,<br><br>Defendants. | Case No. 2:25-cv-02314-MRA-KS<br><br>*Assigned to Hon. Monica Ramirez Almadani*<br><br>**PLAINTIFF VIGEN TOVMASYAN'S RESPONSES TO DEFENDANT TARGET CORPORATION'S INTERROGATORIES (SET ONE)**<br><br>Compl. Filed:      January 30, 2025 |

**PROPOUNDING PARTY**:      DEFENDANT TARGET CORPORATION

**RESPONDING PARTY**:      PLAINTIFF VIGEN TOVMASYAN

**SET NO.**:      ONE

1

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204  |  Glendale, CA 91205

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204  |  Glendale, CA 91205

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify each of the PRODUCTS YOU allege are part of the ACTION.

**RESPONSE TO INTERROGATORY NO. 1:**

Respondent incorporates by reference the Preliminary Statement as if fully stated herein. Respondent objects to this interrogatory on the ground that the information sought is in the possession of, known to, or otherwise equally available to the propounding party. Discovery is continuing, and Plaintiff reserves its right to add or amend information according to the results of this continuing investigation and discovery, or as Plaintiff's understanding of the significance of previously discovered or obtained information changes.

Subject to and without waiving the aforementioned objections, Respondent responds as follows: Good & Gather Spinach Artichoke Dip; Good & Gather Cranberry Jalapeno Dip; Good & Gather Taco Dip; and Good & Gather Tzatziki Yogurt Dip.

**INTERROGATORY NO. 2:**

Identify each representation regarding the PRODUCTS YOU contend is false and misleading.

**RESPONSE TO INTERROGATORY NO. 2:**

Respondent incorporates by reference the Preliminary Statement as if fully stated herein. Respondent objects on the grounds that the Interrogatory is vague and ambiguous, including as to the terms/phrase "representation," "false" and "misleading." Respondent objects to this request on the ground that it calls for an impermissible expert opinion. Respondent objects to this interrogatory to the extent it

3

PLAINTIFF'S RESPONSES TO DEFENDANT'S INTERROGATORIES (SET ONE)

calls for an improper legal conclusion. Discovery is continuing, and Plaintiff reserves its right to add or amend information according to the results of this continuing investigation and discovery, or as Plaintiff's understanding of the significance of previously discovered or obtained information changes. Subject to and without waiving the aforementioned objections, Respondent responds as follows: Plaintiff challenges the "No Artificial Flavors, **Preservatives**, or Synthetic Colors" representation.

**INTERROGATORY NO. 3:**

Explain YOUR basis for claiming that citric acid is used as a preservative ingredient in the PRODUCTS.

**RESPONSE TO INTERROGATORY NO. 3:**

Respondent incorporates by reference the Preliminary Statement as if fully stated herein. Respondent objects on the grounds that the Interrogatory is vague and ambiguous, including as to the terms/phrase "basis." Respondent objects to this request on the ground that it calls for an impermissible expert opinion. Respondent objects to this interrogatory to the extent it calls for an improper legal conclusion. Subject to and without waiving the aforementioned objections, Respondent responds as follows:

Please refer to Paragraphs 20-28 of Plaintiff's complaint.

**INTERROGATORY NO. 4:**

Identify each of the PRODUCTS YOU purchased, including where YOU purchased it and the date of each and every purchase.

**RESPONSE TO INTERROGATORY NO. 4:**

Respondent incorporates by reference the Preliminary Statement as if fully stated herein. Respondent objects to this interrogatory on the grounds that it is compound,

4

Malk & Pogo Law Group, LLP  |  1241 S. Glendale Ave. Suite 204  |  Glendale, CA 91205

## <u>VERIFICATION</u>

I, Vigen Tovmasyan, am the plaintiff and class representative in this matter, Case No. 2:25-cv-02314-MRA-KS, and I am authorized to make this Verification for and on behalf of myself in the within action.

I have read the foregoing document, entitled **PLAINTIFF VIGEN TOVMASYAN'S RESPONSES TO DEFENDANT TARGET CORPORATION'S INTERROGATORIES (SET ONE)**, I am familiar with its contents, and I am informed and believe, and on that basis allege, that the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July __28__, 2025, at ___10:22am_____.

_____

Plaintiff Vigen Tovmasyan

11

PLAINTIFF'S RESPONSES TO DEFENDANT'S INTERROGATORIES (SET ONE)

Doc ID: b654da8e919b010ea7fc3bcb52b73897b2c94ff9

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

VIGEN TOVMASYAN, individually and on behalf of all others similarly situated,

                      Plaintiff,       Case No. 2:25-cv-02314-MRA-KS

        vs.

TARGET CORPORATION, a corporation, and DOES 1-20, inclusive,

                  Defendants.

_____

REMOTE VIDEOCONFERENCE

DEPOSITION OF COURTNEY ANNE JACOBSON

December 3, 2025

8:41 a.m.

WITNESS APPEARING REMOTELY IN

MINNEAPOLIS, MINNESOTA

REPORTED BY:

Lisa McGarry, CSR, RPR

CSR No. 13114

Deposition of PMK, Courtney Anne Jacobson

THE WITNESS:  Yes.  I did say that front labels are important.

BY MR. MALKHASYAN:

Q.  Why are they important?

A.  Because they are required to be able to be sold, and it helps the guests find products that they are looking for on the shelf.

Q.  Did you believe it is important that front labels are accurate?

A.  Yes.

MR. MALKHASYAN:  Great.

Marianna, can you pull up Exhibit 2.  Sorry. Exhibit 3, which is the pictures of the product.  Great.

Q.  Are you familiar with these labels?  Let's go back up to Number 1.  Are you familiar with this label?

A.  It appears to be Spinach and Artichoke Dip.  It doesn't have our pack copy number on it, which they normally do, but if this image was taken from Target.com, that could have been removed.  But it does appear to be our label.

(Plaintiff's Exhibit 3 was

marked for identification

and is attached hereto.)

MR. MALKHASYAN:  Okay.  Can you scroll to Number 2.

Q.   Are you familiar with this label?

A.   Same.   It appears to be Cranberry Jalapeno Dip. I would expect there to be a pack copy number on it, but, again, if this image was taken from Target.com, that could have been removed.

MR. MALKHASYAN:   Okay.   Scroll to Number 3.

Q.   Are you familiar with this label?

A.   This is a Good & Gather Taco Dip, does not have pack copy on it, but that could have been removed, yes.

Q.   Other than the pack copy number, is there anything else that seems unusual?

A.   I don't believe the item in market today has the new recipe flag.  The new recipe flag is only on shelf for six months, but, otherwise, it appears I am familiar with this label.

Q.   Okay.   And lastly, the last product.

Are you familiar with this label?

A.   The Good & Gather Tzatziki Yogurt Dip, yes.

Q.   Okay.   Do each of these products have the representation no artificial colors, flavors, or preservatives?

A.   These items -- so the claim on the Tzatziki Yogurt Dip is no artificial flavors, artificial preservatives, or synthetic colors.

Q.   Understood.

**EXHIBIT**

**3**

exhibitsticker.com

# EXHIBIT 3

**Good & Gather Spinach Artichoke Dip**



**Good & Gather Cranberry Jalapeno Dip**



**Good & Gather Taco Dip**



**Good & Gather Tzatziki Yogurt Dip**



# EXHIBIT E

| Product Name: | Cranberry Jalapeno Dip | Quantity: | 10 oz | DPCI: | 216330096 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

| Product Names | |
|---|---|
| Brand: | Good & Gather |
| Product Type: | RTE |
| Target Product Name: | Cranberry Jalapeno Dip |

| Quantity of Contents Declaration | |
|---|---|
| Declared Quantity: | NET WT 10 oz (283g) |
| Declared Drained Weight: | |
| Random Weight Units: | |
| Printing: | Printed on Line |
| Min Print Height: | |

| Product Claims & Statements | | | |
|---|---|---|---|
| **Product Claims:** | | | |
| | **Claim** | **SupportingText** | **Use On Pack** |
| | Other | Made with Cream Cheese, Dried Cranberries, Jalapeno peppers & White Cheddar Cheese | Principal Display Panel |
| **Ingredient, Nutrient Content & Health Claims:** | **Claim** | **SupportingText** | **Use On Pack** |
| | **SupportingText** | | **Use On Pack** |
| | No Artificial Flavors | | Principal Display Panel |
| | No Artificial Preservatives | | Principal Display Panel |
| | No Synthetic Color | | Principal Display Panel |
| **Safe Handling Statements:** | **Text** | | **Use On Pack** |
| | Keep Refrigerated | | Principal Display Panel |
| **Warning Statements:** | **Text** | | **Use On Pack** |
| **Taste Icons:** | **Text** | | **Use On Pack** |
| **Facts Up Front:** | **Icon** | **SupportingText** | **Use On Pack** |
| **Required Copy:** | **Text** | **Copy Notes** | **Use On Pack** |
| | Serving Suggestion | | Principal Display Panel |

TARGET_00000019

| Product Name: | Cranberry Jalapeno Dip | Quantity: | 10 oz | DPCI: | 216330096 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

## Nutrition Information

| | |
|---|---|
| - | |

| Nutritional Facts Panel | Nutrition Facts | | |
|---|---|---|---|
| | Servings Per Container | about 10 | |
| | Serving Size | 2 Tbsp (30g) | |
| | | Amount Per Serving | %Daily Value* |
| | Calories | 80 | |
| | Total Fat | 6g | 8% |
| | Saturated Fat | 4g | 20% |
| | Trans Fat | 0g | |
| | Cholesterol | 15mg | 5% |
| | Sodium | 220mg | 10% |
| | Total Carbohydrate | 5g | 2% |
| | Dietary Fiber | 0g | 0% |
| | Total Sugars | 4g | |
| | Includes | 3g Added Sugars | 6% |
| | Protein | 1g | |
| | Vitamin D | 0mcg | 0% |
| | Calcium | 40mg | 4% |
| | Iron | 0mg | 0% |
| | Potassium | 50mg | 2% |
| | * The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice. | | |
| | Note: This representation of the nutrition declaration is not a guide to the formatting, it is intended to output compliant data only. | | |
| Supporting Statements and Panel Format: | Linear | | |

## Ingredients List

**INGREDIENTS:** CREAM CHEESE (PASTEURIZED MILK AND CREAM, CHEESE CULTURE, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM) SOUR CREAM (GRADE A CULTURED CREAM), DRIED CRANBERRIES (CRANBERRIES, SUGAR, NON-HYDROGENATED SUNFLOWER OIL), JALAPEÑO PEPPERS (JALAPEÑO PEPPERS, WATER, VINEGAR, SALT, CALCIUM CHLORIDE), WHITE CHEDDAR CHEESE (CULTURED PASTEURIZED MILK, SALT, ENZYMES, POWDERED CELLULOSE [TO PREVENT CAKING]), NATURAL FLAVORS, SUGAR, SALT, GRANULATED GARLIC, LEMON JUICE CONCENTRATE, ONION POWDER, NISIN PREPARATION (TO PRESERVE QUALITY), SPICE, CITRIC ACID, XANTHAN GUM.

| Legal Statements: | |
|---|---|

## Allergens & BE Information

| Contains/PAL/BE: | **CONTAINS MILK** |
|---|---|
| Other Allergen Declarations: | |

## Country of Origin Labeling (COOL)

TARGET_00000020

| Product Name: | Cranberry Jalapeno Dip | Quantity: | 10 oz | DPCI: | 216330096 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

| Country of Origin Labeling – US Customs & Border Protection: | Not Required - Do not use in labeling |
|---|---|
| Country of Origin - CBP: | United States |
| Country of Origin Labeling - USDA: | Not Required - Do not use in labeling |
| Country of Origin - USDA: | United States |
| Country of Origin Statements | |

**How 2 Recycle Information\n**

| H2R Info: | Not Required | H2R Tile # | Use On Pack |
|---|---|---|---|
| | | | |

**Prep & Recipe**

| Preparation Guidelines: | |
|---|---|
| Recipe and Extended Use Content: | |

**Product Codes**

| UPC: | 085239168349 |
|---|---|
| Vendor Label/Part Number: | |

**Additional Information**

| Any Other Information (Front of Pack): | |
|---|---|
| Any Other Information (Back of Pack): | |

**Pack Copy**

| Specification Status: | Pack Copy Sent |
|---|---|
| Specification Number: | 27447 |
| Version: | 3 |
| Pack Copy Version: | B |
| First Production Review Date | 24/09/23 |

**Non Copy Information**

| Technologist: | Maryjane Bjorklund |
|---|---|
| Target Contacts: | Courtney Jacobson Sara Herman |

TARGET_00000021

| Product Name: | Cranberry Jalapeno Dip | Quantity: | 10 oz | DPCI: | 216330096 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

| Non Copy Information | |
|---|---|
| DPCI | 216330096 |
| Reason for Issue of Pack Copy: | Revise label claim |

| Vendor & Contact Details | |
|---|---|
| Business Partner ID: | 39593 |
| Vendor Name: | Elevation Foods |
| Vendor Address: | 1600 Harris Road |
| | Knoxville |
| | Tennessee |
| | 37924 |
| | United States |
| Facility Name: | Elevation Foods |
| Facility Code: | 39593-16986206 |
| Facility Address: | 1600 Harris Rd. |
| | Knoxville |
| | Tennessee |
| | 37924 |
| | United States |

| Vendor Contact: | Name | Telephone | Fax | E-Mail Address |
|---|---|---|---|---|
| | | | | |

TARGET_00000022

# EXHIBIT F

**Product Name:** Cranberry Jalapeno Dip **Quantity:** 10 oz **DPCI** 216330096 **Facility:** House of Thaller, Inc.

| Pack Copy | |
|---|---|
| Target Product Name: | Cranberry Jalapeno Dip |
| Not Required | |
| Specification Status: | Pack Copy Sent |
| First Production Review Date | 22/04/21 |
| Specification Number: | 27447 |
| Version: | 1 |
| Pack Copy Version: | A |
| Season | |

| Non Copy Information | |
|---|---|
| Technologist: | Shannon Nichols |
| Other Contacts: | Courtney Jacobson |
| | Catherine Potter |
| DPCI | 216330096 |
| Commenter | Package Engineer |
| Pack Copy to be Forwarded To: | Courtney Jacobson |
| Reason for Issue of Pack Copy: | New |
| Details Of Other Documents To Be Sent Separately: | |
| Design Comments: | |
| Not Required | |

| Not Required | |
|---|---|
| CAD Reference: | |
| Primary Pack Format: | |
| Product Shoot: | |
| Shelf Ready Packaging Reason: | |
| Current / Proposed Format: | |
| Current / Proposed Material: | |

| Not Required | | | |
|---|---|---|---|
| Printer Name: | | Contact Name: | |
| Printer Address: | | E-Mail Address: | |
| | | Telephone: | |
| | | Fax: | |
| | | Packaging Component: | |

9 Mar 2021 19:51

TARGET_00000023

**Product Name:** Cranberry Jalapeno Dip **Quantity:** 10 oz **DPCI** 216330096 **Facility:** House of Thaller, Inc.

| Not Required | | | | |
|---|---|---|---|---|
| | | **Print Process :** | | |
| | | **Print Substrate:** | | |
| | | **Packaging Format:** | | |
| | | **Colors:** | | |

| Vendor & Contact Details | | | | |
|---|---|---|---|---|
| **Business Partner ID:** | 39593 | | | |
| **Vendor Name:** | House of Thaller | | | |
| **Vendor Address:** | 1600 Harris Road | | | |
| | | | | |
| | Knoxville Tennessee | | | |
| | 37924 | | | |
| | United States | | | |
| **Facility Name:** | | House of Thaller, Inc. | | |
| **Facility Code:** | | 39593-16986206 | | |
| **Facility Address:** | | 1600 Harris Rd. Knoxville Tennessee 37924 United States | | |
| **Artwork Approver:** | **Name** | **Telephone** | **Fax** | **E-Mail Address** |
| | Lauren Wells | +1 (865) 689-5893 Ext:130 (Office) | 865.689.7132 | quality@elevation-foods.com |

| Product Names | |
|---|---|
| **Brand:** | Good & Gather |
| **Product Type:** | RTE |
| **Brand Type:** | Own Label |
| **Not Required** | |
| **Target Product Name:** | Cranberry Jalapeno Dip |
| **Standard of Identity/ Product Identity:** | Cranberry Jalapeno Dip |
| **Not Required** | |
| **Marketing/Romance Copy:** | |

| Product Claims & Statements | | | |
|---|---|---|---|
| **Photo/Illustration on Label:** | No | | |
| **Product Claims:** | **Icon** | **Supporting Text** | **Use on Pack** |
| | Other | Made with Cream Cheese, Dried Cranberries, Jalapeno peppers & White Cheddar Cheese. | Principal Display Panel |

9 Mar 2021 19:51

TARGET_00000024

**Product Name:** Cranberry Jalapeno Dip **Quantity:** 10 oz **DPCI** 216330096 **Facility:** House of Thaller, Inc.

| Product Claims & Statements | | | |
|---|---|---|---|
| **Nutrition Content and Health Claims:** | Icon | Supporting Text | Use on Pack |
| | | | |

| Text | Use on Pack |
|---|---|
| No Artificial Flavors | Principal Display Panel |
| No Artificial Preservatives | Principal Display Panel |
| No Synthetic Color | Principal Display Panel |

| **Safe Handling Statements:** | Text | Use on Pack |
|---|---|---|

| **Warning Statements:** | Text | Use on Pack |
|---|---|---|

| **Taste Icons:** | Text | Use on Pack |
|---|---|---|

| **Facts Up Front:** | Icon | Supporting Text | Use on Pack |
|---|---|---|---|
| | | | |

| **Storage Icons & Guidelines:** | Icon | Supporting Text | Use on Pack |
|---|---|---|---|

| **Required Copy:** | Icon | Supporting Text | Use on Pack |
|---|---|---|---|
| | | | |

| Not Required | | | |
|---|---|---|---|
| **Recycling Icons:** | Recycling Icon | Supporting Text | Use on Pack |

| Ingredients List |
|---|
| **Ingredients:** CREAM CHEESE (PASTEURIZED MILK AND CREAM, CHEESE CULTURE, SALT, LOCUST BEAN GUM AND/OR GUAR GUM AND/OR XANTHAN GUM), SOUR CREAM (GRADE A CULTURED CREAM), DRIED CRANBERRIES (CRANBERRIES, SUGAR, NON-HYDROGENATED SUNFLOWER OIL), JALAPEÑO PEPPERS (JALAPEÑO PEPPERS, WATER, VINEGAR, SALT, CALCIUM CHLORIDE), WHITE CHEDDAR CHEESE (CULTURED PASTEURIZED MILK, SALT, ENZYMES), NATURAL FLAVORS, SUGAR, SALT, GRANULATED GARLIC, LEMON JUICE CONCENTRATE, ONION POWDER, NISIN PREPARATION (TO PRESERVE QUALITY), SPICE, CITRIC ACID, XANTHAN GUM. |

| **Legal Statements:** | |
|---|---|
| **Not Required** | |

9 Mar 2021 19:51

TARGET_00000025

**Product Name:** Cranberry Jalapeno Dip **Quantity:** 10 oz **DPCI:** 216330096 **Facility:** House of Thaller, Inc.

## Nutrition Information

-
**Nutritional Facts Panel**

| Nutrition Facts | | |
|---|---|---|
| Servings Per Container | about 10 | |
| Serving Size | 2 Tbsp (30g) | |
| | Amount Per Serving | %Daily Value* |
| Calories | 80 | |
| Total Fat | 6g | 8% |
|    Saturated Fat | 4g | 20% |
|    Trans Fat | 0g | |
| Cholesterol | 20mg | 7% |
| Sodium | 230mg | 10% |
| Total Carbohydrate | 5g | 2% |
|    Dietary Fiber | 0g | 0% |
|    Total Sugars | 4g | |
|     Includes | 3g Added Sugars | 6% |
| Protein | 1g | |
| Vitamin D | 0mcg | 0% |
| Calcium | 40mg | 4% |
| Iron | 0mg | 0% |
| Potassium | 30mg | 0% |

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

Note: This representation of the nutrition declaration is not a guide to the formatting, it is intended to output compliant data only.

**Supporting Statements and Panel Format :**

## Allergens and Ingredient Validation

| Contains/PAL: | CONTAINS MILK. |
|---|---|
| Other Allergen Declarations: | |

## COOL Ingredient Statements:

## Not Required:

| Preparation Guidelines: | | | |
|---|---|---|---|
| Cooking Icons: | Cooking Icon | Supporting Text | Use on Pack |

**Oven Instructions:**

| Time: | |
|---|---|
| Temp (°C): | |
| Temp (°F): | |
| Temp (Gas): | |

9 Mar 2021 19:51

TARGET_00000026

**Product Name:** Cranberry Jalapeno Dip **Quantity:** 10 oz **DPCI** 216330096 **Facility:** House of Thaller, Inc.

| Not Required: | | | | |
|---|---|---|---|---|
| **Oven From Frozen Instructions:** | | | | |
| | **Time:** | | | |
| | **Temp (°C):** | | | |
| | **Temp (°F):** | | | |
| | **Temp (Gas):** | | | |

**Microwave Instructions:**

| Step | 650W/Cat B | 750W/Cat D | 850W/Cat E |
|---|---|---|---|
| | | | |

**Microwave From Frozen Instructions:**

| Step | 650W/Cat B | 750W/Cat D | 850W/Cat E |
|---|---|---|---|
| | | | |

| | |
|---|---|
| **Shallow Fry Instructions:** | |
| **Stir Fry Instructions:** | |
| **Steam Instructions:** | |
| **Poach Instructions:** | |
| **Boil Instructions:** | |
| **Stove top Instructions** | |
| **Broil Instructions:** | |
| **Deep Fry Instructions:** | |
| **Barbecue Instructions:** | |
| **Other Cooking Instructions:** | |

| Not Required | | |
|---|---|---|
| **Cooking Warnings:** | **Text to be printed alongside statement:** | **Use on Pack** |

| Prep & Recipe | |
|---|---|
| **Preparation Guidlines:** | |
| **Not Required:** | |
| **Recipe and Extended Use Content:** | |

| Product Pack Coding | | |
|---|---|---|
| **Not Required** | **Text** | **Use on Pack** |
| **Not Required** | | |
| **Country Of Origin 1:** | Not Required - Do not use in labeling United States | |
| **Country Of Origin 2:** | | |

9 Mar 2021 19:51

TARGET_00000027

**Product Name:** Cranberry Jalapeno Dip **Quantity:** 10 oz **DPCI** 216330096 **Facility:** House of Thaller, Inc.

| Barcodes & Certificates | | | |
|---|---|---|---|
| **UPC:** | 085239168349 | | |
| **Vendor Label/Part Number:** | | | |
| **Certificates:** | **Type (Do not print on label)** | **Certificate Number for Label** | **Icon for Label** |

| Weights & Measures | |
|---|---|
| **Printing:** | Printed on Line |
| **Location:** | |
| **Print Height:** | |
| **Not required** | No |

| Random Weight | |
|---|---|
| **Units:** | |

| Fixed Weight | |
|---|---|
| **Declared Quantity (Metric & U.S. Customary Terms):** | 10oz (283g) |
| **Drained Weight (Metric & U.S. Customary Terms)** | |

| Additional Information | |
|---|---|
| **Any Other Information (Front of Pack):** | |
| **Any Other Information (Back of Pack):** | |
| **Not Required** | No |
| **Not Required** | No |
| **Copyright Year:** | - |
| **Not Required** | - |
| **Alternate COOL Statement 1** | |
| **Alternate COOL Statement 2** | |
| **Target Approver Name:** | Jenna Baumgartner |
| **Target Approver's Job Title:** | Sr. Labeling Specialist |
| **Target Approval Date:** | 09/03/21 |

| Pack Copy | |
|---|---|
| **Target Product Name:** | Cranberry Jalapeno Dip |
| **Not Required** | |
| **Specification Status:** | Pack Copy Sent |
| **First Production Review Date** | 22/04/21 |

9 Mar 2021 19:51

TARGET_00000028

**Product Name:** Cranberry Jalapeno Dip **Quantity:** 10 oz **DPCI:** 216330096 **Facility:** House of Thaller, Inc.

| Pack Copy | |
|---|---|
| Specification Number: | 27447 |
| Version: | 1 |
| Pack Copy Version: | A |
| Season | |

| Other Details | |
|---|---|
| Packaging Design Date: | |
| Film to Printer Date: | |
| Pack Copy Status: | |
| Will Specified Board and Ink be used?: | |
| If No, give reasons: | |
| Primary Pack Format - List Items: | |
| Photography - Confirmation of when Products will be ready to shoot: | |
| Is Product in 'Shelf Ready Packaging'? (If Not Give Reason): | Yes |
| Current / Proposed Format: | |
| Current / Proposed Material: | |

9 Mar 2021 19:51

TARGET_00000029

# EXHIBIT G

| Product Name: | Taco Dip | Quantity: | 12 oz | DPCI: | 216330052 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

## Product Names

| | |
|---|---|
| **Brand:** | Good & Gather |
| **Product Type:** | RTE |
| **Target Product Name:** | Taco Dip<br>Made with Sour Cream, Cream Cheese, Salsa & Jalapeño Peppers |

## Quantity of Contents Declaration

| | |
|---|---|
| **Declared Quantity:** | NET WT 12 OZ (340g) |
| **Declared Drained Weight:** | |
| **Random Weight Units:** | |
| **Printing:** | Printed on Line |
| **Min Print Height:** | |

## Product Claims & Statements

| **Product Claims:** | | | |
|---|---|---|---|
| | Claim | SupportingText | Use On Pack |

| **Ingredient, Nutrient Content & Health Claims:** | Claim | SupportingText | Use On Pack |
|---|---|---|---|
| | SupportingText | | Use On Pack |
| | No Artificial Preservatives | | Principal Display Panel |
| | No Synthetic Color | | Principal Display Panel |
| | No Artificial Flavors | | Principal Display Panel |

| **Safe Handling Statements:** | Text | | Use On Pack |
|---|---|---|---|
| | Keep Refrigerated | | Principal Display Panel |

| **Warning Statements:** | Text | | Use On Pack |
|---|---|---|---|

| **Taste Icons:** | Text | | Use On Pack |
|---|---|---|---|

| **Facts Up Front:** | Icon | SupportingText | Use On Pack |
|---|---|---|---|

| **Required Copy:** | Text | Copy Notes | Use On Pack |
|---|---|---|---|
| | Serving Suggestion | | Principal Display Panel |

## Nutrition Information

| | |
|---|---|
| - | |

TARGET_00000050

| Product Name: | Taco Dip | Quantity: | 12 oz | DPCI: | 216330052 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

## Nutrition Information

| Nutritional Facts Panel | Nutrition Facts | | |
|---|---|---|---|
| | Servings Per Container | about 11 | |
| | Serving Size | 2 Tbsp (30g) | |
| | | Amount Per Serving | %Daily Value* |
| | Calories | 60 | |
| | Total Fat | 5g | 6% |
| |    Saturated Fat | 3.5g | 18% |
| |    Trans Fat | 0g | |
| | Cholesterol | 20mg | 7% |
| | Sodium | 220mg | 10% |
| | Total Carbohydrate | 2g | 1% |
| |    Dietary Fiber | 0g | 0% |
| |    Total Sugars | 1g | |
| |      Includes | 0g Added Sugars | 0% |
| | Protein | 1g | |
| | Vitamin D | 0mcg | 0% |
| | Calcium | 30mg | 2% |
| | Iron | 0mg | 0% |
| | Potassium | 60mg | 2% |
| | * The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice. Note: This representation of the nutrition declaration is not a guide to the formatting, it is intended to output compliant data only. | | |
| Supporting Statements and Panel Format: | Linear | | |

## Ingredients List

INGREDIENTS: SOUR CREAM (CULTURED CREAM), CREAM CHEESE (PASTEURIZED MILK AND CREAM, CHEESE CULTURES, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM), MEDIUM SALSA (TOMATOES, TOMATO JUICE, ONION, BELL PEPPERS, SALT, VINEGAR, DEHYDRATED GARLIC, MODIFIED FOOD STARCH, CITRIC ACID, SPICES), SEASONING BLEND (YELLOW CORN FLOUR, SALT, MALTODEXTRIN, PAPRIKA, SPICES, MODIFIED CORN STARCH, SUGAR, GARLIC POWDER, CITRIC ACID, YEAST EXTRACT, ONION POWDER, RED PEPPER), JALAPEÑO PEPPERS (GREEN JALAPEÑO PEPPERS, WATER, VINEGAR, SALT, CALCIUM CHLORIDE), NATURAL FLAVORS, NISIN PREPARATION (TO PRESERVE QUALITY), XANTHAN GUM.

| Legal Statements: | |
|---|---|

## Allergens & BE Information

| Contains/PAL/BE: | CONTAINS MILK<br>LABEL DECLARATION: BE FOOD DISCLOSURE - CONTAINS A BIOENGINEERED FOOD INGREDIENT |
|---|---|
| Other Allergen Declarations: | |

TARGET_00000051

| Product Name: | Taco Dip | Quantity: | 12 oz | DPCI: | 216330052 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

### Country of Origin Labeling (COOL)

| Country of Origin Labeling – US Customs & Border Protection: | Not Required - Do not use in labeling |
|---|---|
| Country of Origin - CBP: | United States |
| Country of Origin Labeling - USDA: | Not Required - Do not use in labeling |
| Country of Origin - USDA: | United States |
| Country of Origin Statements | |

### How 2 Recycle Information\n

| H2R Info: | Not Required | H2R Tile # | Use On Pack |
|---|---|---|---|
| | | | |

### Prep & Recipe

| Preparation Guidelines: | |
|---|---|
| Recipe and Extended Use Content: | |

### Product Codes

| UPC: | 085239109564 |
|---|---|
| Vendor Label/Part Number: | |

### Additional Information

| Any Other Information (Front of Pack): | |
|---|---|
| Any Other Information (Back of Pack): | |

### Pack Copy

| Specification Status: | Pack Copy Sent |
|---|---|
| Specification Number: | 26000 |
| Version: | 5 |
| Pack Copy Version: | E |
| First Production Review Date | 24/09/23 |

### Non Copy Information

| Technologist: | Maryjane Bjorklund |
|---|---|
| Target Contacts: | Courtney Jacobson Sara Herman |

TARGET_00000052

| Product Name: | Taco Dip | Quantity: | 12 oz | DPCI: | 216330052 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

| Non Copy Information | |
|---|---|
| DPCI | 216330052 |
| Reason for Issue of Pack Copy: | - |

| Vendor & Contact Details | |
|---|---|
| Business Partner ID: | 39593 |
| Vendor Name: | Elevation Foods |
| Vendor Address: | 1600 Harris Road |
| | Knoxville |
| | Tennessee |
| | 37924 |
| | United States |
| Facility Name: | Elevation Foods |
| Facility Code: | 39593-16986206 |
| Facility Address: | 1600 Harris Rd. |
| | Knoxville |
| | Tennessee |
| | 37924 |
| | United States |

| Vendor Contact: | Name | Telephone | Fax | E-Mail Address |
|---|---|---|---|---|

TARGET_00000053

# EXHIBIT H

# REDACTED VERSION OF DOCUMENT

**EXHIBIT**

7

exhibitsticker.com

# EXHIBIT 7

### Header

| | |
|---|---|
| Spec Name: | Taco Dip |
| Spec No.: | 26000 |
| Version: | 4 |
| Status: | Superseded |
| Specification Type: | Pre-packed Food |

## MAIN DETAILS

### Main Details

| | |
|---|---|
| Business Category: | 216-33 Entertaining |
| States where item cannot be sold: | - |
| Product &/or Package Type: | - |
| Not Required: | - |
| Brand Type: | Own Label |
| Brand: | Good & Gather |
| Product Type: | RTE |
| Not Required: | - |
| Legislation: | US |

### Product Coverage

| Product Name | Net Quantity | DPCI |
|---|---|---|
| Taco Dip | 12 oz | 216330052 |

### Key Dates

| | |
|---|---|
| First Production Review Date: | 9/24/23 |
| Out Of Store Date: | 11/3/24 |
| Seasonal Product: | No |
| Season: | - |
| Set Date: | 9/24/23 |
| Actual Set Date: | 9/24/23 |
| Review Date: | 4/5/26 |

### Vendor Details

| | |
|---|---|
| Vendor Product Reference: | - |
| Source: | Target Brand Compliance |

| Business Partner ID | Vendor Name | Address 1 | Address 2 | Address 3 | Address 4 | Country | Zip Code |
|---|---|---|---|---|---|---|---|
| ▇ | Elevation Foods | 1600 Harris Road | - | ▇ | ▇ | | |

### Primary Facilities

| Facility Code | Facility Name | Address 1 | Address 2 | Address 3 | Address 4 | Country | Zip Code |
|---|---|---|---|---|---|---|---|
| ▇ | Elevation Foods | 1600 Harris Rd. | - | | Knoxville | Tennessee | United States | 37924 |

### Secondary Facilities

| Facility Code | Facility Name | Address 1 | Address 2 | Address 3 | Address 4 | Country | Zip Code |
|---|---|---|---|---|---|---|---|

### Vendor Contacts

| Name | Phone | Email |
|---|---|---|
| Halia Walrond | ▇ | ▇ |

### Target Contacts

| Role | Name |
|---|---|
| Product Administrator | Maryjane Bjorklund |
| Labeling & Regulatory Compliance | Courtney Jacobson |
| Product Development Scientist | Sara Herman |

### Temporary Specifications

| Effective From | Effective To | Status | Products Affected |
|---|---|---|---|

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

TARGET_00000189

## Specification History

**History From Previous Versions:**

| Commenter | Comments | Version | Date |
|---|---|---|---|
| Vendor | ▬▬▬▬▬ | 3 | 5/8/23 |
| Package Engineer | ▬▬▬▬▬ | 3 | 7/24/23 |
| Labeling & Regulatory Compliance | - | 2 | 4/7/21 |
| Package Engineer | ▬▬▬▬ | 2 | 8/5/21 |
| Package Engineer | ▬▬▬ | 1 | 11/15/19 |

| Commenter | Comments | Version | Date |
|---|---|---|---|
| Vendor | Update recipe - adding cream cheese | 4 | 9/19/23 |

## Final Approval

| | |
|---|---|
| Vendor Approver: | Halia Walrond |
| Target Approver: | Maryjane Bjorklund |
| Vendor Approver's Job Title: | Regulatory Supervisor |
| Target Approver's Job Title: | Sr PDS |
| Vendor Approved Date: | 4/4/24 |
| Target Approved Date: | 4/5/24 |

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

TARGET_00000190

**FORMULA AND RAW MATERIALS**



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

**FORMULA AND RAW MATERIALS**



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

## Ingredients

**Ingredients List:**

INGREDIENTS: sour cream (CULTURED CREAM), Cream Cheese (PASTEURIZED MILK, PASTEURIZED CREAM, CHEESE CULTURES, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM), medium salsa (TOMATOES, TOMATO JUICE, ONION, BELL PEPPERS, SALT, VINEGAR, DEHYDRATED GARLIC, MODIFIED FOOD STARCH, CITRIC ACID, SPICES), seasoning blend (YELLOW CORN FLOUR, SALT, MALTODEXTRIN, PAPRIKA, SPICES, MODIFIED CORN STARCH, SUGAR, GARLIC POWDER, CITRIC ACID, YEAST EXTRACT, ONION POWDER, RED PEPPER), Jalapeno Peppers (GREEN JALAPENO PEPPERS, WATER, VINEGAR, SALT, CALCIUM CHLORIDE), NATURAL FLAVORS, NISIN PREPARATION, XANTHAN GUM.

## Comments

**Comments:** -

## Raw Materials

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

TARGET_00000192

% of Net Quantity:

Declarations

### Statements

| | |
|---|---|
| Ingredients List: | **INGREDIENTS:** sour cream (CULTURED CREAM), Cream Cheese (PASTEURIZED MILK, PASTEURIZED CREAM, CHEESE CULTURES, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM), medium salsa (TOMATOES, TOMATO JUICE, ONION, BELL PEPPERS, SALT, VINEGAR, DEHYDRATED GARLIC, MODIFIED FOOD STARCH, CITRIC ACID, SPICES), seasoning blend (YELLOW CORN FLOUR, SALT, MALTODEXTRIN, PAPRIKA, SPICES, MODIFIED CORN STARCH, SUGAR, GARLIC POWDER, CITRIC ACID, YEAST EXTRACT, ONION POWDER, RED PEPPER), Jalapeno Peppers (GREEN JALAPENO PEPPERS, WATER, VINEGAR, SALT, CALCIUM CHLORIDE), NATURAL FLAVORS, NISIN PREPARATION, XANTHAN GUM. |
| Ingredients List on Pack?: | Yes |
| On-Pack Ingredients: | **INGREDIENTS:** SOUR CREAM (CULTURED CREAM), CREAM CHEESE (PASTEURIZED MILK AND CREAM, CHEESE CULTURES, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM), MEDIUM SALSA (TOMATOES, TOMATO JUICE, ONION, BELL PEPPERS, SALT, VINEGAR, DEHYDRATED GARLIC, MODIFIED FOOD STARCH, CITRIC ACID, SPICES), SEASONING BLEND (YELLOW CORN FLOUR, SALT, MALTODEXTRIN, PAPRIKA, SPICES, MODIFIED CORN STARCH, SUGAR, GARLIC POWDER, CITRIC ACID, YEAST EXTRACT, ONION POWDER, RED PEPPER), JALAPEÑO PEPPERS (GREEN JALAPEÑO PEPPERS, WATER, VINEGAR, SALT, CALCIUM CHLORIDE), NATURAL FLAVORS, NISIN PREPARATION (TO PRESERVE QUALITY), XANTHAN GUM. |
| | Recipe Last Re-calculation: - |
| | THE ON-PACK INGREDIENTS FIELD WAS UPDATED THE LAST TIME THE RECIPE WAS CALCULATED |
| Do Not Calculate On-Pack Ingredients: | - |
| Not Required: | Text |
| Legal Labeling Statements: | Text |

### Not Required

- -

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

TARGET_00000193

# EXHIBIT I

| Product Name: | Tzatziki Yogurt Dip | Quantity: | 9 oz | DPCI: | 216330054 | Facility Name: | Aliments Fontaine Sante INC |
|---|---|---|---|---|---|---|---|

| Product Names | |
|---|---|
| Brand: | Good & Gather |
| Product Type: | RTE |
| Target Product Name: | TZATZIKI YOGURT DIP |

| Quantity of Contents Declaration | |
|---|---|
| Declared Quantity: | NET WT 9 OZ (255 G) |
| Declared Drained Weight: | N/A |
| Random Weight Units: | |
| Printing: | Printed on Line |
| Min Print Height: | |

| Product Claims & Statements | | | |
|---|---|---|---|
| Product Claims: | | | |
| | Claim | SupportingText | Use On Pack |
| | | Made with yogurt, sour cream, garlic, cucumbers and dill | Principal Display Panel |
| Ingredient, Nutrient Content & Health Claims: | Claim | SupportingText | Use On Pack |
| | | | |

| | SupportingText | Use On Pack |
|---|---|---|
| | No Artificial Preservatives | Principal Display Panel |
| | No Synthetic Color | Principal Display Panel |
| | No Artificial Flavors | Principal Display Panel |

| Safe Handling Statements: | Text | Use On Pack |
|---|---|---|
| | Other Best consummed within 3 to 5 days after opening | Information Panel |
| | Perishable | Principal Display Panel |
| | Keep Refrigerated | Principal Display Panel |

TARGET_00000070

| Product Name: | Tzatziki Yogurt Dip | Quantity: | 9 oz | DPCI: | 216330054 | Facility Name: | Aliments Fontaine Sante INC |
|---|---|---|---|---|---|---|---|

## Product Claims & Statements

**Warning Statements:**

| Text | Use On Pack |
|---|---|
| | |

**Taste Icons:**

| Text | Use On Pack |
|---|---|
| | |

**Facts Up Front:**

| Icon | SupportingText | Use On Pack |
|---|---|---|
| | | |

**Required Copy:**

| Text | Copy Notes | Use On Pack |
|---|---|---|

## Nutrition Information

-

**Nutritional Facts Panel**

### Nutrition Facts

| Servings Per Container | About 9 | |
|---|---|---|
| Serving Size | 2 tbsp. (30g) | |
| | Amount Per Serving | %Daily Value* |
| Calories | 40 | |
| Total Fat | 2.5g | 3% |
| Saturated Fat | 1.5g | 8% |
| Trans Fat | 0g | |
| Cholesterol | 10mg | 3% |
| Sodium | 135mg | 6% |
| Total Carbohydrate | 2g | 1% |
| Dietary Fiber | 0g | 0% |
| Total Sugars | 1g | |
| Includes | 0g Added Sugars | 0% |
| Protein | 2g | |
| Vitamin D | 0mcg | 0% |
| Calcium | 50mg | 4% |
| Iron | 0mg | 0% |
| Potassium | 0mg | 0% |

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

Note: This representation of the nutrition declaration is not a guide to the formatting, it is intended to output compliant data only.

**Supporting Statements and Panel Format:**

## Ingredients List

**INGREDIENTS:** YOGURT (SKIM MILK, CREAM, SKIM MILK POWDER, MODIFIED CORN STARCH, BACTERIAL CULTURES), SOUR CREAM (MILK, CREAM, NONFAT DRY MILK, BACTERIAL CULTURE, MICROBIAL ENZYME), CUCUMBER, CANOLA OIL, SALT, MODIFIED CORN

TARGET_00000071

| Product Name: | Tzatziki Yogurt Dip | Quantity: | 9 oz | DPCI: | 216330054 | Facility Name: | Aliments Fontaine Sante INC |
|---|---|---|---|---|---|---|---|

### Ingredients List

STARCH, VINEGAR, GARLIC, CITRIC ACID, DILL.

| Legal Statements: | |
|---|---|

### Allergens & BE Information

| Contains/PAL/BE: | CONTAINS MILK. |
|---|---|
| Other Allergen Declarations: | |

### Country of Origin Labeling (COOL)

| Country of Origin Labeling – US Customs & Border Protection: | Pre-printed on Label - PRODUCT OF |
|---|---|
| Country of Origin - CBP: | Canada |
| Country of Origin Labeling - USDA: | Pre-printed on Label - PRODUCT OF |
| Country of Origin - USDA: | Canada |
| Country of Origin Statements | |

### How 2 Recycle Information

| H2R Info: | Not Required | H2R Tile # | Use On Pack |
|---|---|---|---|

### Prep & Recipe

| Preparation Guidelines: | |
|---|---|
| Recipe and Extended Use Content: | |

TARGET_00000072

| Product Name: | Tzatziki Yogurt Dip | Quantity: | 9 oz | DPCI: | 216330054 | Facility Name: | Aliments Fontaine Sante INC |
|---|---|---|---|---|---|---|---|

**Product Codes**

| UPC: | 085239277171 |
|---|---|
| Vendor Label/Part Number: | |

**Additional Information**

| Any Other Information (Front of Pack): | |
|---|---|
| Any Other Information (Back of Pack): | |

**Pack Copy**

| Specification Status: | Pack Copy Sent |
|---|---|
| Specification Number: | 28743 |
| Version: | 1 |
| Pack Copy Version: | A |
| First Production Review Date | 03/03/22 |

**Non Copy Information**

| Technologist: | Courtney Osamoh |
|---|---|
| Target Contacts: | Courtney Jacobson  Catherine Potter |
| DPCI | 216330054 |
| Reason for Issue of Pack Copy: | Ruby |

**Vendor & Contact Details**

| Business Partner ID: | 64302 |
|---|---|
| Vendor Name: | Aliments Fontaine Sante INC |
| Vendor Address: | 450 Deslauriers |
| | Montreal |
| | Quebec |
| | H4N 1V8 |
| | Canada |
| Facility Name: | Aliments Fontaine Sante INC |
| Facility Code: | 64302-322935 |
| Facility Address: | 450 Deslauriers St |
| | Saint-Laurent |

TARGET_00000073

| Product Name: | Tzatziki Yogurt Dip | Quantity: | 9 oz | DPCI: | 216330054 | Facility Name: | Aliments Fontaine Sante INC |
|---|---|---|---|---|---|---|---|

| Vendor & Contact Details | | | | |
|---|---|---|---|---|
| | Quebec | | | |
| | H4N 1V8 | | | |
| | Canada | | | |
| Vendor Contact: | Name | Telephone | Fax | E-Mail Address |
| | Elodie Pecheux | 5145772225 | | epecheux@fontainesante.com |

TARGET_00000074

# EXHIBIT J

| Product Name: | Spinach Artichoke Dip | Quantity: | 12 oz | DPCI: | 216330138 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

| Product Names | |
|---|---|
| **Brand:** | Good & Gather |
| **Product Type:** | RTE |
| **Target Product Name:** | Spinach Artichoke Dip Made with Artichokes, Cream Cheese, Spinach, Mozzarella & Feta Cheese |

| Quantity of Contents Declaration | |
|---|---|
| **Declared Quantity:** | 12 oz (340g) |
| **Declared Drained Weight:** | |
| **Random Weight Units:** | |
| **Printing:** | Printed on Line |
| **Min Print Height:** | |

| Product Claims & Statements | | |
|---|---|---|

| **Product Claims:** | | | |
|---|---|---|---|
| | Claim | SupportingText | Use On Pack |
| | Other | Serve Hot or Cold | Principal Display Panel |

| **Ingredient, Nutrient Content & Health Claims:** | | | |
|---|---|---|---|
| | Claim | SupportingText | Use On Pack |
| | SupportingText | | Use On Pack |
| | Other Heat and Serve | | Do Not Use |
| | No Artificial Preservatives | | Principal Display Panel |
| | No Synthetic Color | | Principal Display Panel |
| | No Artificial Flavors | | Principal Display Panel |

| **Safe Handling Statements:** | | |
|---|---|---|
| | Text | Use On Pack |
| | Keep Refrigerated | Do Not Use |

| **Warning Statements:** | | |
|---|---|---|
| | Text | Use On Pack |

| **Taste Icons:** | | |
|---|---|---|
| | Text | Use On Pack |

| **Facts Up Front:** | | | |
|---|---|---|---|
| | Icon | SupportingText | Use On Pack |

| **Required Copy:** | | | |
|---|---|---|---|
| | Text | Copy Notes | Use On Pack |

TARGET_00000030

| Product Name: | Spinach Artichoke Dip | Quantity: | 12 oz | DPCI: | 216330138 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

## Nutrition Information

| - | |
|---|---|

**Nutritional Facts Panel**

### Nutrition Facts

| Servings Per Container | about 12 | |
|---|---|---|
| Serving Size | 2 Tbsp (30g) | |
| | Amount Per Serving | %Daily Value* |
| Calories | 60 | |
| Total Fat | 5g | 6% |
|   Saturated Fat | 2.5g | 13% |
|   Trans Fat | 0g | |
| Cholesterol | 10mg | 3% |
| Sodium | 160mg | 7% |
| Total Carbohydrate | 2g | 1% |
|   Dietary Fiber | 0g | 0% |
|   Total Sugars | 1g | |
|     Includes | 0g Added Sugars | 0% |
| Protein | 1g | |
| Vitamin D | 0mcg | 0% |
| Calcium | 40mg | 2% |
| Iron | 0mg | 0% |
| Potassium | 20mg | 0% |

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

Note: This representation of the nutrition declaration is not a guide to the formatting, it is intended to output compliant data only.

**Supporting Statements and Panel Format:**

## Ingredients List

**INGREDIENTS:** ARTICHOKES (ARTICHOKES, WATER, SALT, CITRIC ACID, ASCORBIC ACID), CREAM CHEESE (PASTEURIZED MILK AND CREAM, CHEESE CULTURE, SALT, STABILIZERS [CAROB BEAN AND/OR XANTHAN AND/OR GUAR GUMS]), SPINACH, SOUR CREAM (GRADE A CULTURED CREAM), MAYONNAISE (SOYBEAN OIL, EGG YOLKS, WATER, DISTILLED VINEGAR, SUGAR, SALT, MUSTARD FLOUR), MOZZARELLA CHEESE (CULTURED PASTEURIZED MILK, SALT, ENZYMES), NATURAL FLAVORS, FETA CHEESE (PASTEURIZED PART-SKIM MILK, CHEESE CULTURE, SALT, ENZYMES), PARMESAN CHEESE (CULTURED PASTEURIZED MILK, SALT, ENZYMES), SALT, GRANULATED GARLIC, SPICES, NISIN PREPARATION (TO PRESERVE QUALITY).

**Legal Statements:**

## Allergens & BE Information

| Contains/PAL/BE: | CONTAINS EGG AND MILK. |
|---|---|
| Other Allergen Declarations: | |

TARGET_00000031

| Product Name: | Spinach Artichoke Dip | Quantity: | 12 oz | DPCI: | 216330138 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

| Country of Origin Labeling (COOL) | |
|---|---|
| Country of Origin Labeling – US Customs & Border Protection: | Not Required - Do not use in labeling |
| Country of Origin - CBP: | United States |
| Country of Origin Labeling - USDA: | Not Required - Do not use in labeling |
| Country of Origin - USDA: | United States |
| Country of Origin Statements | |

| How 2 Recycle Information\n | | | |
|---|---|---|---|
| H2R Info: | Not Required | H2R Tile # | Use On Pack |
| | | | |

| Prep & Recipe | |
|---|---|
| Preparation Guidelines: | Directions<br><br>Remove lid and film seal. Microwave on HIGH about 2 minutes or until warm, stirring halfway through.<br><br>Appliances may vary; adjust accordingly. Refrigerate or discard leftovers immediately. |
| Recipe and Extended Use Content: | |

| Product Codes | |
|---|---|
| UPC: | 085239107478 |
| Vendor Label/Part Number: | |

| Additional Information | |
|---|---|
| Any Other Information (Front of Pack): | |
| Any Other Information (Back of Pack): | |

TARGET_00000032

| Product Name: | Spinach Artichoke Dip | Quantity: | 12 oz | DPCI: | 216330138 | Facility Name: | Elevation Foods |
|---|---|---|---|---|---|---|---|

| Pack Copy | |
|---|---|
| Specification Status: | Pack Copy Sent |
| Specification Number: | 25978 |
| Version: | 2 |
| Pack Copy Version: | B |
| First Production Review Date | 02/03/23 |

| Non Copy Information | |
|---|---|
| Technologist: | Courtney Osamoh |
| Target Contacts: | Katie Phillips<br>Sara Herman |
| DPCI | 216330138 |
| Reason for Issue of Pack Copy: | New Product |

| Vendor & Contact Details | |
|---|---|
| Business Partner ID: | 39593 |
| Vendor Name: | Elevation Foods |
| Vendor Address: | 1600 Harris Road |
| | |
| | Knoxville |
| | Tennessee |
| | 37924 |
| | United States |
| Facility Name: | Elevation Foods |
| Facility Code: | 39593-16986206 |
| Facility Address: | 1600 Harris Rd. |
| | |
| | Knoxville |
| | Tennessee |
| | 37924 |
| | United States |

| Vendor Contact: | Name | Telephone | Fax | E-Mail Address |
|---|---|---|---|---|
| | Lauren Wells | +1 (865) 689-5893 Ext: 130 (Office) | 865.689.7132 | quality@elevation-foods.com |

TARGET_00000033

# EXHIBIT K

# REDACTED VERSION OF DOCUMENT

## Header

| | |
|---|---|
| Spec Name: | Spinach Artichoke Dip |
| Spec No.: | 25978 |
| Version: | 4 |
| Status: | Active |
| Specification Type: | Pre-packed Food |

## MAIN DETAILS

### Main Details

| | |
|---|---|
| Business Category: | 216-33 Entertaining |
| States where item cannot be sold: | - |
| Product &/or Package Type: | Designed for Target (Exclusive) |
| Not Required: | - |
| Brand Type: | Own Label |
| Brand: | Good & Gather |
| Product Type: | RTE |
| Not Required: | - |
| Legislation: | US |

### Product Coverage

| Product Name | Net Quantity | DPCI |
|---|---|---|
| Spinach Artichoke Dip | 12 oz | 216330138 |

### Key Dates

| | |
|---|---|
| First Production Review Date: | 12/7/23 |
| Out Of Store Date: | - |
| Seasonal Product: | No |
| Season: | - |
| Set Date: | 12/31/23 |
| Actual Set Date: | 12/31/23 |
| Review Date: | 2/10/27 |

### Vendor Details

| | |
|---|---|
| Vendor Product Reference: | - |
| Source: | Target Brand Compliance |

| Business Partner ID | Vendor Name | Address 1 | Address 2 | Address 3 | Address 4 | Country | Zip Code |
|---|---|---|---|---|---|---|---|
| ███ | Elevation Foods | 1600 Harris Road | - | ████ | ████ | ████████ | |

### Primary Facilities

| Facility Code | Facility Name | Address 1 | Address 2 | Address 3 | Address 4 | Country | Zip Code |
|---|---|---|---|---|---|---|---|
| ████████ | Elevation Foods - Danvers | 144 PINE ST | - | DANVERS | Massachusetts | United States | 01923 |
| ████████ | Elevation Foods | 1600 Harris Rd. | - | Knoxville | Tennessee | United States | 37924 |

### Secondary Facilities

| Facility Code | Facility Name | Address 1 | Address 2 | Address 3 | Address 4 | Country | Zip Code |
|---|---|---|---|---|---|---|---|

### Vendor Contacts

| Name | Phone | Email |
|---|---|---|
| Halia Walrond | ████████ | ████████████ |

### Target Contacts

| Role | Name |
|---|---|
| Product Administrator | Maryjane Bjorklund |
| Labeling & Regulatory Compliance | Courtney Jacobson |
| Product Development Scientist | Sara Herman |

### Temporary Specifications

| Effective From | Effective To | Status | Products Affected |
|---|---|---|---|

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY                    TARGET_00000344

## Specification History

**History From Previous Versions:**

| Commenter | Comments | Version | Date |
|---|---|---|---|
| Package Engineer | ██████ | 3 | 8/7/23 |
| Vendor | █████████ | 3 | 5/10/23 |
| Labeling & Regulatory Compliance | - | 2 | 10/31/22 |
| Package Engineer | ████████ | 2 | 1/25/23 |
| Package Engineer | ██████ | 1 | 11/15/19 |

| Commenter | Comments | Version | Date |
|---|---|---|---|
| Vendor | Label claim revision | 4 | 4/30/24 |
| Package Engineer | Lynn Hyldon | 4 | 7/10/24 |

## Final Approval

| | |
|---|---|
| Vendor Approver: | Halia Walrond |
| Target Approver: | Maryjane Bjorklund |
| Vendor Approver's Job Title: | Regulatory Compliance Supervisor |
| Target Approver's Job Title: | Sr PDS |
| Vendor Approved Date: | 10/31/24 |
| Target Approved Date: | 2/10/25 |

██████

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

TARGET_00000345

**FORMULA AND RAW MATERIALS**



HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY

## Ingredients

Ingredients List:

**INGREDIENTS:** Artichokes (ARTICHOKES, WATER, SALT, CITRIC ACID, ASCORBIC ACID), cream cheese (PASTEURIZED MILK, PASTEURIZED CREAM, CHEESE CULTURES, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM), SPINACH, sour cream (CULTURED CREAM), mayonnaise (SOYBEAN OIL, EGG YOLK, WATER, DISTILLED VINEGAR, SUGAR, SALT, MUSTARD FLOUR), mozzarella cheese (PASTEURIZED PART-SKIM MILK, CHEESE CULTURES, SALT, ENZYMES, POWDERED CELLULOSE), NATURAL FLAVORS, feta cheese (PASTEURIZED PART-SKIM MILK, CHEESE CULTURES, PASTEURIZED MILK, SALT, ENZYMES, RENNET, POWDERED CELLULOSE), parmesan cheese (PASTEURIZED MILK, CHEESE CULTURES, SALT, ENZYMES, POWDERED CELLULOSE), SALT, GRANULATED GARLIC, NISIN PREPARATION, SPICES.

## Comments

Comments:                              -

4/22

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY                              TARGET_00000347

Declarations

**Statements**

| | |
|---|---|
| Ingredients List: | **INGREDIENTS:** Artichokes (ARTICHOKES, WATER, SALT, CITRIC ACID, ASCORBIC ACID), cream cheese (PASTEURIZED MILK, PASTEURIZED CREAM, CHEESE CULTURES, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM), SPINACH, sour cream (CULTURED CREAM), mayonnaise (SOYBEAN OIL, EGG YOLK, WATER, DISTILLED VINEGAR, SUGAR, SALT, MUSTARD FLOUR), mozzarella cheese (PASTEURIZED PART-SKIM MILK, CHEESE CULTURES, SALT, ENZYMES, POWDERED CELLULOSE), NATURAL FLAVORS, feta cheese (PASTEURIZED PART-SKIM MILK, CHEESE CULTURES, PASTEURIZED MILK, SALT, ENZYMES, RENNET, POWDERED CELLULOSE), parmesan cheese (PASTEURIZED MILK, CHEESE CULTURES, SALT, ENZYMES, POWDERED CELLULOSE), SALT, GRANULATED GARLIC, NISIN PREPARATION, SPICES. |
| Ingredients List on Pack?: | Yes |
| On-Pack Ingredients: | **INGREDIENTS:**ARTICHOKES (ARTICHOKES, WATER, SALT, CITRIC ACID, ASCORBIC ACID), CREAM CHEESE (PASTEURIZED MILK AND CREAM, CHEESE CULTURE, SALT, GUAR GUM, CAROB BEAN GUM, XANTHAN GUM), SPINACH, SOUR CREAM (GRADE A CULTURED CREAM), MAYONNAISE (SOYBEAN OIL, EGG YOLKS, WATER, DISTILLED VINEGAR, SUGAR, SALT, MUSTARD FLOUR), MOZZARELLA CHEESE (PASTEURIZED PART SKIM MILK, CHEESE CULTURES, SALT, ENZYMES, POWDERED CELLULOSE [TO PREVENT CAKING]), NATURAL FLAVORS, FETA CHEESE (PASTEURIZED MILK AND SKIM MILK, SALT, ENZYMES, RENNET, POWDERED CELLULOSE [TO PREVENT CAKING]), PARMESAN CHEESE (PASTEURIZED MILK, CHEESE CULTURES, SALT, ENZYMES, POWDERED CELLULOSE [TO PREVENT CAKING]), SALT, GRANULATED GARLIC, NISIN PREPARATION (TO PRESERVE QUALITY), SPICES. |
| | Recipe Last Re-calculation: -<br>THE ON-PACK INGREDIENTS FIELD WAS UPDATED THE LAST TIME THE RECIPE WAS CALCULATED |
| Do Not Calculate On-Pack Ingredients: | - |
| Not Required: | Text |
| Legal Labeling Statements: | Text |

**Not Required**

-  -

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

TARGET_00000348

# EXHIBIT L

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


VIGEN TOVMASYAN, individually  )
and on behalf of all others    )
similarly situated,            )
                               )
                    Plaintiff, )
                               )
        vs.                    )Case No.
                               )2:25-cv-02314-MRA-KS
Target CORPORATION, a          )
Corporation, and DOES 1-20,    )
inclusive,                     )
                               )
                   Defendants. )
_____)


     VIDEOTAPED DEPOSITION OF VIGEN TOVMASYAN, taken on behalf of the Defendant, via Zoom videoconference, commencing at 9:06 a.m. and terminating at 1:41 p.m. on Friday, December 5, 2025, before Adele C. Frazier, Certified Shorthand Reporter No. 9690 for the State of California, pursuant to Notice.


                    ---o0o---


2

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

Q    Mr. Tovmasyan, this lawsuit indicates that you purchased certain products from Target with a brand of Good and Gather.

Are you aware of that?

A    Yes.

Q    Can you identify the products you've purchased that are the subject of this lawsuit?

A    Yes.

Q    Please do.

A    I got the spinach artichoke dip.

Q    Any others?

A    I think I might have gotten one or two before.  I believe, if I'm not mistaken, it was a yogurt dip.

Q    Any others?

A    I don't think so.

Q    So if I understood you correctly, on two or three occasions, you've purchased the Good and Gathered dips that are the subject of this lawsuit?

A    Yeah.

Q    And the flavors that you purchased were a spinach artichoke dip and a yogurt-based dip?

A    Yes.

Q    Which one was your favorite?

A    The spinach.

36

**Tovmasyan v. Target**                                **Vigen Tovmasyan**

MR. MALKHASYAN:  Can we also get a copy of the exhibits when you send it to the court reporter, please?

MS. REGAN:  Yes, certainly.

(Exhibit 1 identified.)

BY MS. REGAN:

Q   Mr. Tovmasyan, I just asked you, you've never purchased this cranberry jalapeno dip; did I hear you say yes, you have not?

A   I don't think I got this one.

Q   And you've never purchased this taco dip depicted on the screen right now; is that right?

A   No, I don't think so.  I think it was yogurt, said yogurt on it, I think.  Yogurt dip.

Q   Mr. Tovmasyan, during the break, did you speak with your attorney?

A   Yes.

Q   At the start of this deposition, Mr. Tovmasyan, you mentioned that the purpose of today was to come to an agreement; did I hear that right?

A   Yes.

Q   What agreement?

A   Well, my final I would like is that the labeling to be removed from the package and all the

40

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

THE REPORTER:  Yes, I'm good.

MS. REGAN:  Adele, would you mind reading back the last question and answer.

(Whereupon the following testimony was read:

read:

"QUESTION:  Other than showing your attorney a website photo for a product you may have purchased, do you have any records of your purchases?

"ANSWER:  No.")

BY MS. REGAN:

Q   Mr. Tovmasyan, are you aware that the spinach artichoke dip that I was just showing you from the complaint contains cream cheese as an ingredient?

A   Yeah, I think so, yes.

Q   Do you like cream cheese?

A   Yes.

Q   So you eat cream cheese outside of this dip?

A   Yeah, I sometimes do.

Q   How do you eat your cream cheese?

A   Maybe on a bagel.

Q   Are you aware that cream cheese contains citric acid as an ingredient?

A   Not specifically like that.

44

**Tovmasyan v. Target**                          **Vigen Tovmasyan**

will consult the food labels for serving sizes or caloric intake?")

MR. MALKHASYAN:  Same objection.

THE WITNESS:  Sometimes -- sometimes I do.

BY MS. REGAN:

Q   And the serving size and caloric intake information is ordinarily on the back label, correct?

A   I think so, yeah.

Q   So you will look at the back label before ingesting a product?

A   Not every single time.

Q   But sometime?

A   Yeah.

Q   Mr. Tovmasyan, you indicated that you purchased the spinach artichoke dip, which store did you purchase that from?

A   Glendale Target.

Q   And when was that purchased?

A   It was September 2024.

Q   Do you remember the approximate date?

A   No.

Q   Do you remember how much you paid for the product on that date in September?

A   I think it was around $5.

Q   And you don't have any receipts that would

46

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

MR. MALKHASYAN:  Vague.

THE REPORTER:  Vague.  Thank you.

BY MS. REGAN:

Q    Mr. Tovmasyan, you said the dip looked appealing; did I hear that right?

A    Yes.

Q    What about it looked appealing?

A    The labelling on it said no preservatives, no artificial ingredients.  It just looked good to me, and I got it.

Q    So you considered the coloring on the label; is that right?

MR. MALKHASYAN:  Objection.  Misstates testimony.

THE WITNESS:  I got it based off of the statement that it said there was no preservatives, there's no artificial ingredients.

BY MS. REGAN:

Q    My question was a little different.

I asked if you considered the coloring of the label in looking at the dip and considering it for purchase.

A    I think I did.

Q    Did you also look at the depiction of the product on the label?

50

**Tovmasyan v. Target**                                  **Vigen Tovmasyan**

A    What's depiction?

Q    I will pull Exhibit 1 back up.

Can you see the image on the screen, Mr. Tovmasyan?

A    Yes.

Q    The depiction of the product on a piece of bread or cracker --

A    Okay.

Q    -- did you also view that?

A    Yeah.

Q    And did you also view the font on the label in purchasing?

A    Yeah.

Q    And did you view the size of the serving of the product?

A    The size, I didn't know.  I didn't look at it like that.

Q    You testified that you only ingested part of the product?

A    Yeah.

Q    And did you pick this dip partially because it's a smaller size?

A    I think so, yeah, that's why I got it.  And I like artichoke dip, that's another reason.

Q    Turning back to the other purchases, you

51

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

testified that you're not sure if you purchased the yogurt dip, correct?

MR. MALKHASYAN:  Objection.  Misstates testimony.

THE WITNESS:  I bought the product before, like the yogurt dip.  I'm not sure if you meant that.

BY MS. REGAN:

Q    And you don't know the date that you might have purchased --

A    No.

Q    -- the yogurt dip?

A    No.

Q    Do you know the year you might have purchased the yogurt dip?

A    I think it might have been the same year or a year before that.

Q    So it would have been in 2024?

A    Yeah, or 2023, I'm not exactly sure.

Q    Do you recall if there were any holidays occurring around the time you might have purchased this yogurt dip?

A    I don't remember like that.

Q    Do you remember what season it was when you purchased the yogurt dip?

A    I remember it was sunny outside, but not the

52

**Tovmasyan v. Target**                              **Vigen Tovmasyan**

season.

MR. MALKHASYAN:  It's always sunny in California, so that doesn't help.

BY MS. REGAN:

Q   Do you remember if you were wearing a jacket or if it was warm outside when you purchased the yogurt dip?

A   I'm usually always in short sleeves, so I don't remember.

Q   So to the best of your recollection, the dips you contend that you purchased were occurring in 2024; is that right?

A   Yes.

Q   Turning back to the spinach artichoke dip that you stated you purchased in September 2024, did you purchase just one item at that time?

A   I don't remember.  Like I said, I might have gotten some other groceries, like some small stuff, or some school supplies.

Q   Would you have purchased more than one of the spinach artichoke on a single trip to the grocery store?

A   Yeah, I think I got one only each time.

Q   You stated that you believe you purchased a yogurt dip in 2024, do you recall the price you paid

53

**Tovmasyan v. Target**                          **Vigen Tovmasyan**

for that dip?

A    I think it was around the same price, if I'm not mistaken.

Q    So that would be approximately $5?

A    Yes.

Q    Do you recall there being any promotion on the item at the time you purchased it?

A    I don't remember.  I don't know.

Q    Do you remember if there were any discounts on the spinach artichoke dip when you purchased it?

A    I don't think so.  I'm not sure if I saw any promotions or anything like that.

Q    Do you recall using any sort of coupon in purchasing the spinach artichoke dip?

A    No.

Q    So you don't recall the price you paid for the spinach artichoke dip; is that right?

MR. MALKHASYAN:  Objection.  Misstates testimony.

THE WITNESS:  I believe it was around $5.

BY MS. REGAN:

Q    And what is the -- strike that.

MS. REGAN:  I'm going to pull up another exhibit.

MR. OWEN:  Valter, you look too excited for the

54

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                               **Vigen Tovmasyan**

A    Svetlana.

Q    So sometimes she will come with you to the grocery store?

A    I will go with her mostly.  She will call me to go with her.

Q    And has she ever been with you when you purchased the spinach artichoke dip?

A    I don't -- I don't believe so.

Q    And your girlfriend does not live with you and your parents; is that right?

A    No.  Yes.  She lives with her parents.

Q    Mr. Tovmasyan, when did you look at the back label of the spinach artichoke dip?

A    I looked at it I want to say a week after I purchased it, around a week after, after I saw this online -- I think it was a video talking about additives, preservatives to foods, and that's what made me look at it around a week or so after.

Q    What was the video you saw about additives?

A    It was just giving, like, a warning that, you know, how like some companies advertise foods, they say it's healthy and stuff, but it contains, like, preservatives, citric acid, or artificial flavorings, and that -- seeing that video, I was thinking to myself I just got something like that,

70

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

and that's when I looked at the back of the package.

Q    And who made this video?

A    I don't know, I don't know who made it.

Q    Where did you view the video?

A    It was on social media.  I don't know which one specifically I saw it on.  It was multiple.

Q    Which social media platforms do you use?

A    I use Snapchat.  I use Instagram.  Sometimes Twitter/X, or I watch stuff on YouTube also.

Q    What about Facebook?

A    No, I deleted my Facebook account a long time ago.

Q    So you're not sure if you saw this video on Snapchat?

A    Yeah, I'm not sure which one of those I saw it in.

Q    And you're not sure if you saw that video on Instagram, correct?

A    Correct.

Q    How long was the video?

A    Maybe a minute, I think.  I'm not sure, maybe two minutes.

Q    Did you watch the video from start to finish?

A    I think I did, yes.

71

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

Q    And you don't recall if you saw this video on YouTube, correct?

A    Correct.

Q    And you don't know if you saw this video on Twitter, correct?

A    Correct.

Q    I think I heard you say earlier that the video specifically referenced citric acid; is that right?

A    Yes.  Not specifically, it just talked about a lot of things, and it also said citric acid a couple times, so I was, like, okay, let me look into it.

Q    So the video did mention citric acid specifically?

A    Yes.  Yes.

Q    What else did the video mention?

A    About colorings, and I don't remember what else, honestly.  It was information about food coloring also.

Q    Any other specific ingredients, aside from citric acid that were mentioned in the video?

A    No, just that and the food coloring.

Q    What did the video say about food coloring?

A    It said about artificial, like, red dye.  I

72

**Tovmasyan v. Target**                                          **Vigen Tovmasyan**

believe it was red dye, something along those lines that is added to some foods, some drinks.

Q    You said that you saw this video about a week after you purchased the spinach artichoke dip; is that right?

A    Yes.

Q    And at that time, you still had the product in your possession?

A    I believe I did.

Q    And you indicated that you consumed the product one to two days after purchase; did I hear that right?

A    Yes.

Q    And then a week later, it was still in your fridge?

A    I think so, yeah, I think it was still in my fridge a week later.

Q    And was that one of the -- the first time you purchased the product?

A    No.  I got it -- well, a different flavor of the same brand, I got it previously.

Q    So when did you see this video?

A    After the last time I got it, which was in September, like within a week of the purchase, I saw it a week after a little bit, I'm not exactly sure,

73

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

but it was around the time after the purchase of the spinach artichoke dip.

Q    So you didn't view the back of the spinach artichoke dip until you saw this video; is that right?

A    Yes.

Q    You weren't curious about the serving size or caloric intake of the product when you purchased it?

A    No, not at the time that I saw it.

Q    So in that September 2024 purchase of the spinach artichoke dip, you didn't check the serving size prior to consuming?

A    No, I don't think I did.

MR. MALKHASYAN:  Alison, we're about to approach the second-hour mark.  When you're done with these line of questioning if we can maybe take a five, that would be great.

MS. REGAN:  Yeah, that's fine.

BY MS. REGAN:

Q    When you did look at the back of the label, what do you recall noticing about it?

A    I just read all the information, and from the video that I saw, I remember citric acid information in there.

74

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                          **Vigen Tovmasyan**

Q   What else do you remember about when you viewed the back label of the product?

A   I was more mostly concerned about that, so that's why I -- and I do recall seeing it.

Q   You testified you don't recall who created the video that you saw; is that right?

A   Correct.  Correct.

Q   And what did you do to independently verify its claims about additives?

A   I just looked in the back of the product. If you mean research-wise, I didn't do research, I just saw the back of the -- the food item, and that was it.

Q   What else did the video say about citric acid?

A   It said that it's a preservative.  It's artificial.  It's not good for the human body.

Q   The video said that preservatives are not good for the human body; is that right?

A   Yeah, preservatives, additives, artificial colorings, all of those.

Q   Did the video distinguish between preservatives and artificial preservatives?

A   It was talking about artificial.  I believe it said artificial.

75

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

Q   And what is an artificial preservative?

A   It's some kind of chemical substance they add to foods to make their -- how do you say -- their shelf life longer.

Q   And what's your basis for that understanding?

MR. MALKHASYAN:  Objection.  Vague.

THE WITNESS:  The video said that information, that's where I got it from.

BY MS. REGAN:

Q   So that understanding is just based on a video you saw on social media; is that right?

A   Yes.

Q   And you testified earlier that you don't have any training in chemistry or food science, right?

A   Correct.  All the chemistry I had was in high school, and I had a class in college, but that was around four or five years ago.

Q   So when you viewed the back label, you saw citric acid in the ingredient list; is that right?

A   Yes.  Yes.

Q   What else did you see?

A   I was -- like I said, mostly just focused on citric acid because that was my main concern.  And

76

**Tovmasyan v. Target**                          **Vigen Tovmasyan**

Did you speak with your attorney during the break?

A    Yes.

Q    Before the break, we were talking about outside food that you sometimes purchased.  Do you recall that?

A    Yes.

Q    And we talked about a flying dutchman from In-N-Out.  Do you recall that?

A    Uh-huh.  Yes.

Q    You described some of the ingredients as two patties, onions, and sometimes cheese?

A    Yes.

Q    Have you researched whether any of those ingredients contain citric acid?

A    No, I haven't.

Q    Have you researched whether any of those ingredients contain any other preservatives?

A    No, I have not.

Q    So since learning about citric acid in the two-minute video on social media, your purchasing decisions haven't changed; is that right?

MR. MALKHASYAN:  Objection.  Misstates prior testimony.

THE WITNESS:  On occasions, not all the time.

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

BY MS. REGAN:

Q   Tell me about the occasions that it has changed your purchasing decisions.

A   Like, I would say sticking to, like, more meat and vegetables, yeah, like salads, like nuts.

Q   And would that include fruits as well?

A   Yes, yes.

Q   And you told me earlier that some of the fruits and vegetables you eat, it includes tomatoes and strawberries?

A   Yes.

Q   Are you aware that both of those contain citric acid?

A   No.

Q   Earlier you testified that on, occasion, you drink wine.  Do you remember that?

A   Yes.

Q   Are you aware that wine contains citric acid?

A   No, I'm not.

Q   So your research into citric acid was limited to the two-minute video that you saw on social media --

A   Yes.

Q   -- correct?

79

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

So you have not reviewed any of the FDA guidance cited in the complaint with regard to citric acid; is that right?

A   No, just -- just the video that says it's not healthy.

Q   Your last answer, when I asked you if you've reviewed any of the FDA guidance cited in the complaint, was the answer to that no?

A   Yes.

Q   So the only thing you viewed is the two-minute video that you saw on a social media platform you can't recall; is that right?

A   Correct.

Q   So you didn't review any third-party reviews regarding citric acid, correct?

A   No.  No.

Q   Did you talk to friends or family about citric acid?

A   No.  I just told my attorney about it.

Q   What is citric acid, Mr. Tovmasyan?

A   A type of preservative.

Q   What's your basis for understanding that it's a preservative?

MR. MALKHASYAN:  Objection.  Asked and answered.

THE WITNESS:  The -- the video I saw.

80

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

BY MS. REGAN:

Q   Did the video say that it was always a preservative?

A   I believe so, yes.

Q   So the video didn't speak to the other uses of citric acid in food products; is that right?

A   I don't think it did, just talked about that it's an additive of foods -- food items, and it's not healthy for the human body.

Q   So you're not aware of the other reasons why citric acid might be used in food products?

A   No.

Q   Because you haven't researched beyond that video; is that right?

A   Yes.

Q   How is citric acid made?

A   I don't know, I'm not a scientist.

Q   Do you know if it's a naturally occurring organic molecule?

A   I have -- I don't know.  I don't have information about that.

Q   Are you aware of any other foods that contain citric acid?

A   After you mentioned it, now I do.

Q   At the time that you purchased the product,

81

**Tovmasyan v. Target**                              **Vigen Tovmasyan**

How do you determine when you change your purchasing decisions based on citric acid?  Do you continue eating products you really like, even if they have citric acid?

A    Well, I kind of base it off if I'm getting fat, like not specifically to citric acid, like my overall, my weight.

MR. OWEN:  Can we just break for lunch?

MS. REGAN:  Yeah, that feels like a --

MR. MALKHASYAN:  Yeah, sounds good.  All this food talk.

THE VIDEOGRAPHER:  The time is approximately 11:24 a.m.  We are off the record.

(Lunch recess.)

THE VIDEOGRAPHER:  The time is approximately 12:05 p.m.  We are back on the record.

BY MS. REGAN:

Q    Welcome back, Mr. Tovmasyan.

Were you able to grab some lunch during the break?

A    Yeah.

Q    Earlier you were testifying about a yogurt dip you may have purchased; do you recall that?

A    Yeah.

Q    And you don't remember buying that; is that

94

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                          **Vigen Tovmasyan**

right?

A   I don't remember what?

Q   You don't remember purchasing that?

MR. MALKHASYAN:  Objection.  Misstates testimony.

THE WITNESS:  It was prior to the spinach dip that I bought it.

BY MS. REGAN:

Q   You purchased a yogurt dip prior to which purchase of the spinach dip?

A   The last one that I got in September of 2024.

Q   So you purchased a yogurt dip before September 2024?

A   Yes.

Q   And you're not sure what that dip was?

MR. MALKHASYAN:  Objection.  Misstates prior testimony.  Objection.  Vague.

THE WITNESS:  Just a yogurt dip.

BY MS. REGAN:

Q   So you're not sure if it was a Good and Gathered yogurt dip?

A   Oh, the brand-wise, it was the same brand.

Q   You have a specific recollection of it being the Good and Gathered brand?

95

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

A   It was the same as -- almost all of it was the same as the one that was on the spinach dip, except, like, the flavor.

Q   So you're sure that it was a Good and Gather brand product, right?

A   Yes.

Q   But you don't remember the name of the product?

MR. MALKHASYAN:  Objection.  Misstates prior testimony.  Objection.  Asked and answered.

THE WITNESS:  Yogurt dip.

BY MS. REGAN:

Q   And you can't identify the date on which you might have bought that?

A   No.

Q   Do you remember what store you bought it at?

A   It was the same store as the Glendale Target.

Q   Do you remember how much you might have paid for it?

MR. MALKHASYAN:  Objection.  Asked and answered.

THE WITNESS:  Around $5, again.

BY MS. REGAN:

Q   So if you don't remember the name on the label of the yogurt dip that you claim you bought,

97

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

then you don't remember why you bought it; is that right?

MR. MALKHASYAN:  Objection.  Misstates prior testimony.  Client never testified to not remembering the name on the label.

THE WITNESS:  I just bought it because I just wanted to eat that right in the moment.

BY MS. REGAN:

Q    I'm sorry, could you repeat that answer?

A    Yeah, I just bought it.  I just wanted to eat it in the moment, it looked good to me, so I bought it.

Q    You wanted the yogurt dip in the moment?

A    Yeah.

Q    You thought it looked like it would taste good --

A    Yes.

Q    Is that right?

A    Yes.

Q    And you have a specific recollection that you did like the taste; is that right?

A    Yeah, it was good.

MS. REGAN:  I'm going to pull up another exhibit.  Adele, I think we're on Exhibit 3; is that right?

98

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

Q   And why would that make you purchase the product again?

MR. MALKHASYAN:  Objection.  Misstates prior testimony.

THE WITNESS:  I don't know, honestly.  I can't really answer like that.

BY MS. REGAN:

Q   But you can't say for sure that it would impact your purchasing decisions; is that right?

MR. MALKHASYAN:  Objection.  Misstates prior testimony.

THE WITNESS:  If I saw it has citric acid in it?

BY MS. REGAN:

Q   No, if you learned that certain levels of citric acid were not deemed to be bad, as you claimed in the complaint, would that affect your purchasing decision?

MR. MALKHASYAN:  Objection.  Calls for speculation.

THE WITNESS:  Maybe it could.  Just depending on my decision at that time, and I -- how I feel about it.  Depending on -- yeah, depending on how I think and feel about it at the moment.

BY MS. REGAN:

Q   So that would be impacted by factors other

111

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

back to this specific product, the advertisement on it made me believe and trust that I'm buying whatever it says on it, on the front label, as I'm, like, looking at it, and I bought it, and I ate it, and it turns out I was lied to.  That's -- that's the difference between the others and this product specifically.

If they tell me, well, it has this, this, and that, I will think about it before I buy it.  But if they're advertising it to me saying there's, well, it has no preservatives, natural, et cetera, I will trust it, and I will buy it.

BY MS. REGAN:

Q   So if they say nothing and the product contains a preservative, then it's fine?

MR. MALKHASYAN:  Objection.  Calls for speculation.

THE WITNESS:  It has nothing in there?

BY MS. REGAN:

Q   And if a certain product has no representation about preservatives and it contains preservatives, you would still buy it?

A   I'll think about it at the moment if I should buy it or I should not buy it.

Q   You would consider other factors, like what

113

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

you wanted to eat that day and things like that; is that right?

A    Yeah, depending on my mood, how I feel about it, if I really want to eat it, I don't know.  Can be a lot of factors contributing to it, honestly.

Q    When you purchased the spinach artichoke dip at Target, did you consider alternative dips?

A    No, that one, to be honest, looked good, and just advertisement sold it to me already when I looked at it, and I read it.

Q    Do you recall there being other dips in the same area?

A    I think there might have been.

Q    Similar dips?

A    I think so.

Q    Do you remember any of those brands?

A    No.

Q    So you didn't consider any alternatives when you were buying the spinach artichoke dip?

A    No, since -- since I thought that the previous when I got the yogurt, that I believed it tasted good, and then I got this, I'm like, okay, this will be great, too, and that's why -- and I like spinach dip also, and I picked this one.

Q    Have you purchased other spinach dips?

114

**Tovmasyan v. Target**                          **Vigen Tovmasyan**

A    Yes.

Q    Any other factors that you would consider?

MR. MALKHASYAN:  Objection.  Calls for speculation.

THE WITNESS:  I can't think of anything else. Not specifics and things like that, just broad.

BY MS. REGAN:

Q    But you're not consistently concerned about the ingredients in the products you buy, even to this day; is that fair?

A    No, consistently not.

Q    I'm going to pull up the complaint, which is Exhibit 1.  Are you able to see the complaint on the screen, Mr. Tovmasyan?

A    Yes.

Q    Do you see this paragraph 10, which states, at the end here, the last sentence, "If Plaintiff had known that the products contained a preservative, then Plaintiff would not have purchased the products, or he would have purchased the products at a substantially lower price."

A    Yes.

Q    Do you see that?

A    Yes.

Q    So if you had known that the spinach

116

**LINDA RYAN REPORTING (714) 457-5810**

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

A    No, I don't remember.  The exact number, I do not remember.

Q    Mr. Tovmasyan, did you seek a refund or attempt to return the spinach artichoke dip?

A    No, I didn't.

Q    At the time that you consumed the spinach artichoke dip, were you dissatisfied with the product?

MR. MALKHASYAN:  Objection.  Vague as to "dissatisfied".

THE WITNESS:  I was dissatisfied about the fact that I was lied to.

BY MS. REGAN:

Q    Well, I thought you said you didn't learn about the citric acid until after you had consumed the product; is that right?

A    Yeah.  I learned that it has -- after consuming, I learned that it has citric acid, and that's where I was thinking to myself that I was lied to by the labeling of this product.

Q    So my question was, at the time you were consuming the spinach artichoke dip, were you dissatisfied?

A    With the flavor itself, no, but the idea of how I bought it, thinking that this is has no

133

**Tovmasyan v. Target**                    **Vigen Tovmasyan**

preservatives, and then I found out it has preservatives, that just made me think that I was lied to, but as far as the taste, specifically the taste was good.

Q   Did you complain to Target about your dissatisfaction?

A   No.

Q   Did you complain to any regulatory agency about feeling like you were misled?

A   No, just my attorney.

Q   So once you learned that after you consumed the spinach artichoke dip and realized by reading the back label that it contained citric acid, you contacted your attorney; is that right?

A   Yes.

Q   Did you call him?

A   Yes.

Q   Or did you text him?

A   No, I called him.  I think I called him.

Q   Mr. Tovmasyan, you testified earlier that you generally like spinach artichoke dip; is that right?

A   Yes.

Q   And you also testified that you had not purchased this Good and Gather spinach artichoke dip

134

LINDA RYAN REPORTING (714) 457-5810

Tovmasyan v. Target                              Vigen Tovmasyan

since learning it contained citric acid; is that right?

A    Yes.

Q    Have you identified an alternative spinach artichoke dip that you now purchase?

A    Not yet.  I mostly get it at restaurants I will get it.  But besides restaurants, I haven't really bought it.  I thought about it, which one to buy and which one not to buy.

Q    So you will purchase spinach artichoke dip from, like, a sit-down restaurant; is that right?

A    Yes.

Q    And do you ever ask those restaurants if the spinach artichoke dip contained citric acid?

A    Me personally, I love that restaurant, and the only thing I complain about that restaurant is the drinks sometimes, but the food is amazing, so I never really question their food.

Q    So you like their stuff, so you eat their spinach artichoke dip; is that fair?

A    Yes, and I'm a regular client there.  I love that place.

Q    What is that place called?

A    It's called Houston's.

Q    Houston's.

135

**Tovmasyan v. Target**                          **Vigen Tovmasyan**

talking about one of your favorite places to eat.  I think you said it was called Houston's.  Do you recall that?

A    Yes, I do.

Q    And have you looked into whether the Houston's spinach artichoke dip contains citric acid?

A    No, I haven't.

Q    And would you stop purchasing it and going to Houston's and eating it if you knew that it did?

A    My love for this place will conquer it, I think.

Q    Your love for Houston's conquers all?

A    Yes.

Q    Understood.

So the citric acid wouldn't stop you as it relates to Houston (sic) and their spinach artichoke dip?

A    I don't think so.

Q    And you haven't looked into whether their spinach artichoke dip does, in fact, contain citric acid; is that right?

A    If there's what?

Q    If Houston's spinach artichoke dip does, in fact, contain citric acid, you haven't looked into that?

138

**Tovmasyan v. Target**                                    **Vigen Tovmasyan**

A    No, I haven't done any research about that.

Q    And earlier you were testifying about your usual order from In-N-Out Burger; do you recall that?

A    Yes.

Q    I'm forgetting what the burger was called, the double patty burger.

A    Flying dutchman.

Q    Flying dutchman, that's right.

Have you looked into whether the order from In-N-Out contains citric acid?

A    No, I haven't.

Q    And if it did, would it stop you from purchasing the flying dutchman?

MR. MALKHASYAN:  Objection.  Calls for speculation.

THE WITNESS:  For In-N-Out, maybe, maybe not.

BY MS. REGAN:

Q    Would it depend on what you were in the mood to eat that day?

MR. MALKHASYAN:  Objection.  Calls for speculation.

THE WITNESS:  That can also matter, yes.

BY MS. REGAN:

Q    So what you're desiring to eat is more important than the actual ingredients; is that fair?

139

**Tovmasyan v. Target**                              **Vigen Tovmasyan**

MR. MALKHASYAN:  Objection.  Misstates prior testimony.  Calls for speculation.

THE WITNESS:  Sometimes I do consider it.  Like I said, like I'm not a super, super healthy person, so sometimes I will think about it, sometimes I wouldn't and all the factors that take place.

BY MS. REGAN:

Q    And sometimes you just eat it because it tastes good; is that fair?

A    Yeah.  I'll eat specifically Houston's until I die.  Hopefully, I live long.

Q    Mr. Tovmasyan, do you understand that this litigation has been filed as a class action?

A    Yes.

Q    Or a proposed class action?

A    Yes.

Q    And do you understand that you've been proposed as the representative of that class?

A    Yes.

Q    To represent other consumers who purchased spinach artichoke dip in California?

A    Yes.

Q    From Target, in store; is that right?

A    Yes.

Q    How many consumers do you believe were

140

**LINDA RYAN REPORTING (714) 457-5810**